UNITED STATES, Appellant,

v.

Jerome FROST, Appellee.

No. 84–945.

District of Columbia Court of Appeals.

Argued March 13, 1985.

Decided Dec. 20, 1985.

Mark H. Dubester, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and

Michael W. Farrell, Thomas J. Tourish, Jr., and Michael Rankin, Asst. U.S. Attys., Washington, D.C., were on brief, for appellant.

Richard K. Gilbert, Washington, D.C., appointed by court, for appellee.

Before NEBEKER and MACK, Associate Judges, and GALLAGHER, Senior Judge.

NEBEKER, Associate Judge:

The United States appeals the trial court's grant of a motion to vacate judgment in a criminal case pursuant to D.C. Code § 23–110(c) (1981),[1] following a decision that Frost had been denied the effective assistance of counsel at trial. Frost was convicted of armed robbery, D.C.Code §§ 22–2901, –3202 (1981), in a jury trial on January 5, 1984. Three codefendants named in the indictment all pled guilty and were sentenced prior to appellee's trial. Frost subsequently filed a motion for a new trial based on newly discovered evidence, which was that two of his former codefendants were prepared to testify that he had nothing to do with the robbery. He then supplemented his motion for a new trial, this time raising the claim of ineffective assistance of counsel under § 23–110. This claim was based on his trial counsel's failure to interview the three codefendants prior to his trial. The trial judge held hearings on the motions and, on June 25, 1984, vacated the judgment of conviction.

**I**

The facts underlying the armed robbery are that on October 6, 1982, at approximately 4:00 a.m., Mr. Walter Dudley was present in an after-hours establishment. He became aware of some commotion and saw a man pull out a pistol, order everyone to lie on the floor, and take a wooden cash

---

1. D.C.Code § 23–110(c) (1981) provides in pertinent part:

"If the court finds that ... there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner, resentence him, grant a new trial, or correct the sentence, as may appear appropriate."

box from behind the bar. Mr. Dudley saw one other man carrying a gun and testified that "at least two or three" individuals were involved in the robbery.

Following the robbery, the perpetrators ran out of the building and were seen immediately by police officers who had been summoned to the scene. The officers gave chase and observed the individuals jump over fences into the back yards of several nearby houses. One officer watched Frost throughout and saw him attempting to hide in a "cubby space" behind a house. The officer ordered Frost to come out and saw him drop something before he did so. Later recovered from the "cubby space" were a wood box containing cash, a pack of Winston cigarettes, and several ladies' handbags. The cigarette pack was analyzed for fingerprints and found to contain the print of Frost's left thumb.

At the post-trial hearing, Frost's trial counsel and the three former codefendants, Walter Bowie, Cornell Thomas, and Nathaniel Jackson, all testified. Trial counsel testified that he had had numerous meetings with the prosecutor, who had indicated that Thomas might agree to testify against Frost and the other two defendants. He had also consulted with Bowie's lawyer, who stated that her client would not be able to exculpate Frost. Finally, he had interviewed a potential witness whose name Frost had provided. She admitted to knowing Frost but denied having been with him at the after-hours club, as he had said. Based upon all of these conversations, counsel stated that, at the time of trial, he felt it would be pointless to interview the three codefendants. At trial, rather than putting on a defense, his strategy was to attack the government's case.

At the hearing, codefendants Thomas, Bowie, and Jackson all admitted to having known one another previously, but each testified that the robbery had happened spontaneously and had not been pre-planned. They claimed that the dice at the crap table had been "loaded" and they wished to get back the money that they

had lost. With respect to Frost, both Thomas and Jackson claimed not to have known him and could not recall whether they had seen Frost in the club. Bowie had known Frost previously but, like the other two, could not remember whether he had seen Frost inside. All three testified that the club had been very crowded on the night of the robbery. That none of the three could recall having seen Frost inside was the exculpatory material proffered in support of the motion. Judge Graae credited the testimony of these witnesses and accordingly granted appellee's motion.

## II

We begin with the proposition that our scope of review in this case is limited to a question of law. D.C.Code § 17–305(a) (1981). Accordingly, it is not up to this court to pass on the credibility of the three potential defense witnesses at the post-trial hearing. Indeed, crediting the testimony of the witnesses as the trial judge did still leaves the constitutional question of adequacy of counsel—the point on which the trial court erred. We look only to the appropriate constitutional standard, set out in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and apply it to the facts at hand.

In *Strickland,* the Supreme Court articulated a two-part test for evaluating claims of ineffective assistance of counsel: First, the defendant must show that counsel's performance was deficient, in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.,* 104 S.Ct. at 2064. Second, the defendant must prove affirmatively that the deficient performance was prejudicial to him. *Id.* In other words, it is incumbent upon him to demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 2068. It is not enough for the defendant to show that the errors had some possible

effect on the outcome of the trial. *Id.* at 2067.

In applying the *Strickland* holding to the facts of this case, we need not first address the performance component of the test. *Id.* at 2069-70. Instead, we find that we are able to dispose of Frost's claim on the ground that any assumed deficiencies were not sufficiently prejudicial to warrant vacating the conviction. In reaching this conclusion, we have considered the totality of the evidence that was before the jury. *Id.* at 2069. The evidence against appellee was strong, if not outright compelling. There were several robbers and one of the gunmen reached behind the bar and grabbed a wooden box, later recovered from where Frost was hiding behind a house. As the robbery ended, at least four individuals ran out of the premises, and the police gave chase immediately. One officer watched Frost throughout, saw him attempt to hide in a "cubby space" behind a house, and arrested him. Next to the wooden box found in the "cubby space" was a pack of cigarettes with Frost's thumbprint on it. Thus the government established flight, concealment, and virtual, if not actual, possession of stolen property. That there was no evidence of a prior plan to rob is of no moment. It is sufficient that Frost joined in by taking the wooden box, fled with it, and hid when chased.

On the other hand, the testimony of Thomas, Bowie, and Jackson was vague and often contradictory. Thomas, for example, denied any recollection of the events in question. Jackson admitted to participating in the robbery but denied that it was pre-planned. And Bowie initially testified that he had worked alone but later changed his story, claiming that the three planned to rob the club because they thought the craps dice were "loaded." Finally, each of the three was careful to testify that he did not remember having seen Frost at the club; none said that Frost had definitely not been on the premises.

In view of the strength of the government's case, we find it highly unlikely that the testimony of Thomas, Bowie, and Jackson, none of whom could affirmatively exculpate Frost, would have probably changed the outcome of the trial. Assuming, *arguendo,* that counsel was deficient in failing to interview these three, we hold that any such failure had "an isolated, trivial effect" on the inferences to be drawn from the evidence. *Id.* at 2069.

Accordingly, we reverse.

MACK, Associate Judge, dissenting:

The trial court has found that appellant Frost was convicted of armed robbery after a trial at which he was denied effective assistance of counsel. The trial court has vacated that conviction, and ordered a new trial after hearing three days of post-trial testimony, and finding, under the two-part test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), that defense counsel's performance was constitutionally deficient, and that such performance prejudiced the defense. I would not disturb that ruling.

In this court the majority declines even to address the question of defense counsel's performance. Significantly, it assumes the deficiency of that performance (which it would be hard-pressed to challenge). There can be no doubt that Frost met his burden in showing this deficiency. Indeed it is undisputed that defense counsel failed to interview, as possible witnesses, three men who were jointly charged with his client, who were negotiating pleas, and who had been sentenced prior to his client's trial.

In *Strickland v. Washington, supra,* 104 S.Ct. at 2065, the Supreme Court held that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." In setting this standard the court borrowed its own language from *McMann v. Richardson,* 397 U.S. 759, 770-71, 90 S.Ct. 1441, 1448-49, 25 L.Ed.2d 763 (1970), where it required "a reasonably competent attorney" whose advice fell "within the range of competence demanded of attorneys in crim-

inal cases." Our own court, prior to *Strickland*, had already recognized the *McMann* reasonableness standard as that applicable to pretrial claims of inadequate preparation. *Monroe v. United States*, 389 A.2d 811, 819 (D.C.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978). Moreover, it is hardly necessary to elaborate on the need for counsel to attempt to locate and interview witnesses prior to trial.

> [R]epresentation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance.

*Moore v. United States*, 432 F.2d 730, 739 (3rd Cir.1970) (footnote omitted). *See also Hampton v. United States*, 340 A.2d 813, 817 (D.C.1975).

In this case counsel's failure to talk to three witnesses, despite their availability, places his performance below the reasonableness standard set forth in *McMann* and adopted in *Strickland* and *Monroe*. Moreover it seems clear here that counsel's failure to interview these witnesses amounted to inadequate preparation as a matter of law. I have read very few, if any, records, where counsel (at risk to his own self interest) has exhibited in post-trial testimony more candor than has counsel in the instant case—candor which deflects the ofttimes advanced theory that the deficiency was the result of a calculated "tactical decision." Thus counsel testified that his client gave him the names of the men who could help his defense and that counsel made no attempt to pursue the matter with these men or their counsel[1] because counsel 1) was cynical despite his client's repeated protestations of innocence; 2) paid more attention to what he was hearing from the government than what he was hearing from his client; 3) was led to believe by the prosecutor[2] that the men would testify against his client; and 4) felt punitive toward his client.[3] This record speaks for itself. Omission to contact potentially useful witnesses constitutes ineffective assistance of counsel and results in reversal unless lack of prejudice is shown. *Farrell v. United States*, 391 A.2d 755, 758–61 (D.C.1978); *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir.), *cert. denied*, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968).

The majority finds it more palatable to dispose of Frost's claim on the ground that the assumed deficiencies were not sufficiently prejudicial to the defense to warrant vacating the conviction. The majority is met at the outset with the trial court's finding that there was a reasonable possibility that, but for counsel's error, the result at trial would have been different; it therefore seeks to weaken the exculpatory impact of the testimony given by the three men at the post-trial hearing, and at the same time to bolster, with a "totality of the evidence" argument, the weak circumstantial evidence against Frost. As to the trial court's crediting of the testimony of the three men, the majority begins by noting that it is not up to this court to pass on the credibility of this testimony and ends by concluding that the testimony was vague and often contradictory. The fact is that

---

1. Counsel testified "and I think I slapped him down, and I basically said that is a waste of time."

2. This is the same prosecutor who sought to elicit from counsel (at the post-trial hearing) admissions that his trial conduct was "tactical."

3. Counsel explained that this antipathy developed after he had unsuccessfully sought the aid of a woman whose name Frost had given him. Frost told his lawyer that the jewelry found in his pocket (and not identified as proceeds of the robbery) belonged to a woman who was with him at the "after-hours joint" and who, knowing a robbery was to take place, gave him the jewelry for safekeeping. When counsel sought verification from the woman, whom he evaluated as a "middle class person," she signed an affidavit—the gist of which was "I have known ... Jerome for a long time. We're very close. I care for him. I wasn't at the crap game." Counsel angrily confronted his client who said, "she did not want to get involved."

the three men, all of whom had been sentenced (two serving time at the D.C. jail, and one at Occoquan) testified at the post-trial hearing only under duress; they admitted that they knew each other and saw each other at the crime site where a "loaded" dice game was in progress (and where with guns they had attempted to recoup their losses) but (in substance) denied knowing Frost until after their arrests (despite persistent and sometimes intimidating questioning). While exhibiting some reluctance to answer the questions of the prosecutor or of new defense counsel, the three appeared to fully cooperate when the court made inquiries. This is the testimony that the trial court found credible.

As to the strength of the evidence at trial, it is an exaggeration to say, as does the majority, that the government's evidence was compelling. This record presents a question of identity; Frost was never identified by anyone as one of the robbers. All we know is that Frost was one of "at least four individuals" who in a chaotic scene ran from an "after hours" premises at four o'clock in the morning and, when chased by police, sought to hide in an area where scattered proceeds of the crime were found, some in close proximity. The record simply does not support the majority's implication that only the "perpetrators [of the robbery] ran" or that Frost joined in the robbery by taking a wooden box.

As against this backdrop, I agree with the trial court that the teaching of *Strickland* requires a new trial. Appellant has shown that "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment"; he has established also that the omission was so serious as to deprive him of a "fair trial, a trial whose result is reliable." *Strickland, supra,* 104 S.Ct. at 2064. I cannot believe that a factfinder, on hearing the testimony of the three men who admitted their complicity in the events culminating in a crime and who denied the complicity of Frost, might not have had a

reasonable doubt as to the guilt of Frost. I respectfully dissent.