Cristina CHAVARRIA, Appellant,

v.

UNITED STATES, Appellee.

Jorge FIGUEROA, Appellant,

v.

UNITED STATES, Appellee.

Nos. 84–1021, 84–1038.

District of Columbia Court of Appeals.

Argued Dec. 18, 1985.

Decided Feb. 13, 1986.

**60**

Stephen L. Braga, Washington, D.C., appointed by this court, for appellant Chavarria.

Mary I. DuVall, Washington, D.C., appointed by this court, submitted on brief, for appellant Figueroa.

T. Mark Flanagan, Jr., Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on brief, for appellee. Steven I. Friedland, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Before FERREN and TERRY, Associate Judges, and PAIR, Senior Judge.

TERRY, Associate Judge:

Appellants were convicted of possession of marijuana with intent to distribute it, in violation of D.C.Code § 33–541(a)(1) (1985 Supp.).[1] Both appellants argue on appeal that the trial court erred in failing to give the jury cautionary instructions regarding the limited admissibility of certain evidence, and that the court abused its discretion by giving the jurors a *Winters* instruction[2] late in the afternoon on their last scheduled day of jury service. In addition, appellant Chavarria argues that she was denied her constitutional right to the effective assistance of counsel. We reject all of these contentions and affirm both convictions.

**I**

One night in July 1983, shortly before midnight, Officers J.A. Moore and James Ginger of the Metropolitan Police were concealed in an observation post about forty feet above street level, maintaining surveillance over the 1400 block of Park Road, Northwest, a neighborhood well known for illicit drug traffic. The area was brightly lit by high-intensity street lights. From their hiding place they saw four persons—Chavarria, Figueroa, Miller, and Parker—engaging in what they believed to be illegal drug transactions.[3] Figueroa was standing on the south side of Park Road, immediately in front of a parked blue and white car. Chavarria was inside that car, seated in the right front seat. Miller was sitting on the steps in front of 1448 Park Road, and Parker was standing about ten or fifteen feet away from him. Several pedestrians were also on the street.

From time to time Officer Moore saw Figueroa raise his hand toward cars traveling along the street while shouting "Ganja, ganja, I got ganja."[4] Figueroa would give a "high-five" gesture, which Moore interpreted as a signal that he was selling "nickel" (five-dollar) bags of marijuana. Both officers heard Miller tell Figueroa to "quiet down, there's police all over," to which Figueroa replied, "You got to advertise this, you got to advertise this." The officers also heard two pedestrians tell Figuer-

---

1. Two co-defendants, Gregory Miller and James Parker, who were tried along with appellants, were acquitted of the same charge. Miller, however, was found guilty on another charge of possession of marijuana with intent to distribute it, based on evidence applicable only to him, and also of willful failure to appear in court as required, in violation of the District of Columbia Bail Act, D.C.Code § 23–1327(a) (1981).

Miller has not appealed from either of those convictions.

2. *See Winters v. United States,* 317 A.2d 530 (D.C.1974) (en banc).

3. All four were identified in court by both officers.

4. "Ganja" is a slang term for marijuana.

oa and Miller, "You know it's after 11:00. You better close up shop."

On several occasions Officer Moore saw Figueroa approach a stopped car, engage in a short conversation with the driver, and then give the driver a manila envelope in exchange for money. He would then walk over to the blue and white car and give the money to Chavarria, who would give him manila envelopes in return. In addition, Miller was twice seen making exchanges with persons on bicycles. Miller would hand manila envelopes to the bikers in return for money, then walk over to the blue and white car and give the money to Chavarria. Meanwhile, Officer Ginger saw Parker approach a stopped car and engage in conversation with the driver. He then walked over to the blue and white car, made an exchange with Chavarria, returned to the driver of the stopped car, made another exchange of "something" (Ginger could not see what it was) for money, and then went back to Chavarria and made yet another exchange. Throughout the period of observation, Chavarria was seated in the parked car holding a purse on her lap. Officer Moore saw her put money in the purse, remove manila envelopes from the purse, and then place the purse on the floor.

After watching these activities for about twenty minutes, the officers left their observation post to arrest the four suspects, broadcasting a request for assistance from other officers in the area. Two police cars arrived within three or four minutes, just as Officers Moore and Ginger reached the street. Moore and Ginger went over to the parked car and asked Chavarria to step outside. On the floor of the car, beneath the right front seat where she had been sitting, Officer Moore found an open purse containing six manila envelopes and a substantial amount of cash. Each of the manila envelopes contained marijuana.

In the meantime, as the officers were approaching the parked car, Figueroa started to run away, while Miller attempted to walk into a crowd of people that had begun to gather. Both Figueroa and Miller were apprehended by other officers, as was Parker. A search of Miller yielded $122 in cash and three manila envelopes containing marijuana.

At trial Chavarria testified that she was innocent of any wrongdoing. She said that she and her husband had been on their way to Virginia to meet some friends when they stopped in the 1400 block of Park Road so that her husband could buy some cigarettes. As she was waiting for him to come back to the car, she saw a package lying on the street that she believed might contain money. She picked it up and, without opening it, placed it in her purse. Shortly thereafter, before her husband returned, she was arrested.

Figueroa testified that he had gone into a store on Park Road to buy a beer. As he came out, he met an acquaintance, Gilbert Wright, and stopped to talk for a few minutes. Then, as he started to walk back to his car, he was arrested. He said that he did not run away, but rather ignored the police officers when they first called to him to stop because he thought they were shouting at someone else. When they called to him a second time, however, he stopped and was placed under arrest. Wright corroborated Figueroa's testimony.[5]

The jury quickly found Miller guilty of the Bail Act violation. However, after sending the court two notes requesting further instructions, the jury informed the court that it was unable to reach a decision on any of the charges of possession with intent to distribute. Therefore, at approximately 3:00 p.m. on Friday afternoon, the last scheduled day of jury service for these jurors, and over the objections of defense

5. Miller's defense went solely to the charge of bail jumping. Parker presented a single witness, Clyde Hartridge, who testified that he and Parker had been visiting an arcade that evening and that Parker had left at about 11:00 o'clock. When Hartridge came out of the arcade a few minutes later, he saw Parker and the other three defendants being arrested.

counsel, the court gave a *Winters* instruction. An hour and a half later, at 4:30 p.m., the jury returned a verdict of guilty against Chavarria and Figueroa, and against Miller on a separate drug charge, and acquitted Parker.

## II

Appellants contend that the trial court committed plain error in failing to give limiting instructions to the jury regarding the admissibility of certain evidence. Chavarria argues that the court should have instructed the jury that the "hearsay declarations of Messrs. Figueroa and Miller concerning the advertising of 'ganja' and the likelihood of police in the area" and the actions of Figueroa in fleeing and of Miller in walking into the crowd when the police arrived were inadmissible against her. She maintains that "[d]espite the highly inflammatory nature of such evidence, the trial court did nothing at the time it was introduced to properly limit its impact." In a similar vein, Figueroa asserts that the court should have given the jury cautionary instructions with respect to the "hearsay declarations of defendant Miller concerning the likelihood of police in the area" and the actions of Chavarria "in possessing and secreting the envelopes and money."

As to the alleged hearsay, we hold that the court committed no error at all in failing to give cautionary instructions. In the first place, Miller's comment was not even hearsay, since it was not offered to prove the truth of the matter stated, *viz.*, that there were police in the area. On the other hand, Figueroa's repeated statements ("I got ganja") were apparently offered to show that he did in fact have "ganja" for sale, and thus that he had a specific intent to distribute marijuana; however, they were admissible as co-conspirator declarations under FED.R.EVID. 801(d)(2)(E), which was expressly adopted by this court in *Butler v. United States*, 481 A.2d 431 (D.C.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985).

Under the holding in *Butler*, "a co-conspirator's out-of-court assertions may be admitted as non-hearsay evidence in the courts of this jurisdiction only if the prosecution proves that (1) a conspiracy existed, (2) the defendant had a connection with the conspiracy, and (3) the co-conspirator made the statements during the course of and in furtherance of the conspiracy." *Id.* at 439. That the substantive crime of conspiracy was neither charged nor alleged is irrelevant. *United States v. Jackson*, 201 U.S. App.D.C. 212, 230, 627 F.2d 1198, 1216 (1980). The co-conspirator exception to the hearsay rule is applicable even though no conspiracy has been charged, so long as the evidence shows, independently of the statements, that "two or more defendants were joint participators in the commission of substantive offenses." *Id.; see Butler, supra; United States v. Rogers*, 652 F.2d 972, 976 (10th Cir.1981); *United States v. Robinson*, 651 F.2d 1188, 1195–1196 (6th Cir.), *cert. denied*, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 183 (1981).

Figueroa's statements about "ganja" were plainly made "during the course of and in furtherance of the conspiracy." *Butler, supra*, 481 A.2d at 439. The government presented evidence connecting Chavarria with the other three defendants in their scheme of illicit drug activity. Chavarria was seen on several occasions handing manila envelopes to Figueroa and Miller in exchange for money. Figueroa and Miller were both seen making similar exchanges with the occupants of several stopped cars and bicycles. Thus the existence of a conspiracy and the connection of both appellants to that conspiracy were independently established, as the case law requires. There was, of course, no direct evidence of an agreement among the four defendants, but the circumstantial evidence of a conspiracy was strong. Figueroa's statements related to the conspirators' attempts to advertise and sell "ganja," or marijuana, the unlawful objective of the conspiracy. We therefore hold that the statements were admissible against all four

defendants without any limiting instruction.

█ As for the evidence of the attempted flight of Figueroa and Miller, we find no plain error in the court's failure to give cautionary instructions. We agree that, if requested, the court should have advised the jury to consider Figueroa's attempted flight only as it related to Figueroa's consciousness of guilt, and not to Chavarria's guilt or innocence. *See United States v. Pate*, 543 F.2d 1148, 1149 (5th Cir.1976). The same instruction, if requested, should have been given as to both Chavarria and Figueroa with respect to Miller's attempt to walk away. It is true, as the government argues, that "if [a conspiracy] be shown by the evidence to exist, the act of one or more defendants in furtherance of the common plan is in law the act of all." *Davis v. United States*, 12 F.2d 253, 257 (5th Cir.) (citations omitted), *cert. denied*, 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1153 (1926), quoted in *United States v. Jackson, supra*, 201 U.S.App.D.C. at 230 n. 36, 627 F.2d at 1216 n. 36. However, the government has cited no case, and we are aware of none, holding that an attempt by one conspirator to flee from the scene of the crime is admissible against other co-conspirators who remain behind. We are not willing so to hold, especially on the facts of this case, which at least suggest that the conspiracy ended with the sudden appearance of the police. Since the attempted flight of Figueroa and Miller occurred after that, we are not persuaded that their actions were in furtherance of the conspiracy, for "[t]here can be no furtherance of a conspiracy that has ended." *Lutwak v. United States*, 344 U.S. 604, 617–618, 73 S.Ct. 481, 489–490, 97 L.Ed. 593 (1953).

█ Defense counsel, however, did not request any cautionary instructions, so the question we must decide is whether the trial court's failure to give cautionary instructions constituted plain error. *Jones v. United States*, 477 A.2d 231, 241 (D.C. 1984). "Under that standard, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc) (citations omitted).

Even assuming that cautionary instructions should have been given, their absence certainly does not rise to the level of plain error. Under the circumstances of this case, neither the probative value nor the prejudicial effect of the flight evidence was significant. It was obviously probative as to Figueroa, because he was the one who started to flee—and of course he does not contest its admissibility. The fact that Figueroa ran away, however, could not have substantially prejudiced Chavarria in light of the other strong evidence of her guilt, including especially the purse containing money and marijuana which was found under the front seat of the car. Moreover, her defense was that she was innocently sitting in the parked car waiting for her husband to return from the store. She did not contest the fact that illicit drug activity was taking place or that her co-defendants were involved, but only maintained that she had nothing to do with it. Neither Figueroa's nor Miller's flight could have had any adverse effect on this defense. In addition, the trial court instructed the jury that it should consider each defendant's case separately "as if he or she were being tried alone," and that "[t]he guilt or innocence of any one defendant of any of the crimes charged should not control or influence your verdicts as to the other defendants." On this record we conclude that the lack of a limiting instruction with respect to the evidence of flight was not plain error as we have defined that term in *Watts*.[6]

---

6. In *United States v. Johnson,* 496 A.2d 592, 595 (D.C.1985), we held that the flight of the driver of a car could be considered by police officers "in determining whether they had a reasonable, articulable suspicion, based on all the circumstances, that would justify detaining" the two passengers in the car who did not flee, when other evidence linked the group together in suspicious activity. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We did

 Finally, Figueroa claims that the acts of Chavarria in "possessing and secreting" the manila envelopes and money were inadmissible against him. This argument is without merit. The marijuana and money that were found in Chavarria's possession were admissible as circumstantial evidence against all of the defendants, linking each of them to the scheme to distribute marijuana, as well as to the distribution itself. Consistent with the government's proof that all the defendants were acting in concert, Chavarria's acts of possessing and secreting the envelopes were done both in the course of and in furtherance of the conspiracy. Evidence of those acts was thus admissible without limitation against all the co-conspirators. *See Davis v. United States, supra.*

### III

Appellants next contend that the effect of the trial court's *Winters* instruction on Friday afternoon, the last day of jury service for this group of jurors, was to coerce a verdict of guilty. In assessing such a claim of error, this court "must look to the total circumstances to determine whether [the verdict] was coerced," keeping in mind that the giving of a *Winters* instruction is left to "the sound discretion of the trial judge." *Wilson v. United States*, 419 A.2d 353, 356 (D.C.1980).

The jury began its deliberations at 3:20 p.m. on a Thursday. At 4:45 the court received a note from the jury asking, "What was the testimony of Officer Moore concerning Miller and the blue and white car?" The jurors were advised that their recollection controlled, and then they were dismissed for the day.

At approximately 9:35 a.m. on Friday, the jury resumed deliberations. Less than two hours later, the court received a second note from the jury, this time asking to be reinstructed on the principle of reasonable

doubt. The court granted the request. Deliberations were then suspended for an hour to let the jurors have lunch. In mid-afternoon, at about 3:00 p.m., the jury sent the court a third note stating, "We are able to come to a decision only on one of six counts, and feel we cannot come to an agreement on the five [other] counts." In particular, the jury had not yet reached a decision with respect to any of the counts charging possession with intent to distribute.

 Over the objections of all defense counsel, the court gave the jury a *Winters* instruction. At 4:30 p.m., an hour and a half later, the jury advised the court it had reached a verdict. Chavarria and Figueroa were found guilty, Parker not guilty, and Miller guilty on a separate count that applied only to him. Looking at all the circumstances, as the *Wilson* case commands, we are satisfied that the verdict in this case was not coerced by the giving of the *Winters* instruction.

In *Wilson v. United States, supra,* the trial judge received three notes from the jury, each one informing him that it was unable to come to a decision. After receiving the first note, the judge urged the jurors to continue their efforts and immediately excused them for lunch. When he received the second note, about an hour after deliberations had resumed, the judge summoned a juror who had reportedly attempted to leave the deliberations and, under oath, reminded the juror of her obligations. The other jurors were then brought into the courtroom and given a *Winters* instruction. A few hours later the judge received a third note, again stating that the jury was unable to reach a decision.[7] The judge thereupon excused the jury until the following day. Within an hour after returning the next morning, the jury announced a verdict of guilty. On

not hold in *Johnson,* nor do we now, that the flight of one co-conspirator can be used as evidence of guilt against other co-conspirators.

7. Actually, the note was from the juror previously summoned. It stated simply that she was "not able to come to a conclusion at this time." *Wilson, supra,* 419 A.2d at 355.

appeal this court upheld the verdict, remarking that "there were no external factors bearing on the jurors," and that the case simply involved "a jury's decision based solely on the proof offered at trial." *Wilson, supra,* 419 A.2d at 357 n. 3.

Different circumstances were presented in *Morton v. United States,* 415 A.2d 800 (D.C.1980). In that case a juror's brother died during the second day of deliberations. The juror asked to be excused, stating that she was under emotional strain, but after inquiry by the court she agreed to continue deliberating. The jury did not reach a verdict, however, until after it received a *Winters* instruction on the following day. In setting aside the verdict, we expressed our concern "that a substantial risk of a coerced verdict was present," which "created a substantial possibility of diverting the jury deliberations from the essential neutral and nondistracting atmosphere." *Id.* at 802–803. We said, however, that we found "no fault in the *Winters* charge per se," and believed it would have been appropriate "absent the personal problems of the juror." *Id.* at 803.

In two other cases worth noting, convictions were overturned because of coercive jury instructions. In *Jenkins v. United States,* 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), the jury reported an inability to agree, to which the judge replied, "You have got to reach a decision in this case." The Supreme Court found this statement to be coercive and reversed the ensuing conviction. In *Jackson v. United States,* 368 A.2d 1140 (D.C.1977), the trial judge made certain comments to the jury after receiving a note that stated, "One of the jurors feels that a verdict in this case cannot be given. Reason: previous experience of a family member of a similar case that came to mind since commencing deliberations today." The judge told the jurors, "This whole job is a dirty job. Let's be honest with it. You are supposed to find guilt or innocence here, ladies and gentlemen. All I am asking that you do, since you sat here for two days, is do your job.

Go back and commence your deliberations." The judge also intimated that the recalcitrant juror "was guilty of either perjury or negligence in her response to questions on voir dire and that she was not complying with her oath as a juror." *Id.* at 1142. This court reversed the conviction, concluding that the guilty verdict had been coerced by the judge's remarks.

In the case at bar, unlike *Jenkins* and *Jackson,* no statement was made by the trial judge "which could be characterized as an overreaction." *Wilson, supra,* 419 A.2d at 357. The jury had some difficulty reaching a decision, but that difficulty was not due to any extraneous factors as in *Morton.* The fact that the jury had reached a partial verdict and twice requested specific guidance and reinstruction shows that the jury performed its duty carefully and conscientiously. Moreover, after receiving the *Winters* charge, the jury deliberated for another hour and a half, and it acquitted co-defendant Parker, against whom the evidence was clearly the weakest. We cannot say that the verdict was coerced as to Chavarria and Figueroa but not as to Parker. Nor can we accept appellants' speculation, which has no support in the record, that the jurors were coerced into returning a verdict by the mere fact that it was their last scheduled day of jury service. We hold, therefore, that this case is controlled by *Wilson,* and that the giving of the *Winters* instruction was not an abuse of the trial court's discretion.

## IV

Finally, Chavarria claims that her Sixth Amendment right to the effective assistance of counsel was abridged when her attorney failed to request cautionary instructions concerning the limited admissibility of certain evidence. This claim is entirely without merit.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial

cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To prevail on a claim of ineffective assistance, a defendant must make a two-part showing: first, "that counsel's performance was deficient," and second, "that the deficient performance prejudiced the defense." *Id.*[8] Defining the type of prejudice that must be shown under the second prong of the test, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, *the result of the proceeding would have been different.* A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* 104 S.Ct. at 2068 (emphasis added). Unless the defendant demonstrates *both* professional incompetence *and* prejudice to the defense, as defined in *Strickland,* a court may not overturn a conviction on the ground of ineffective assistance of counsel. *Id.* at 2064; *see United States v. Frost,* 502 A.2d 462 (D.C.1985); *United States v. Debango,* 780 F.2d 81, 85–86 (D.C.Cir.1986).

■ In this case, regardless of whether her counsel's performance was deficient, Chavarria clearly has not made the requisite showing of prejudice. As we have held, one of the alleged hearsay declarations of which she now complains was not hearsay, and the other was admissible under the co-conspirator exception to the hearsay rule. Thus the court would properly have denied a request for a cautionary instruction, had one been made. Although we agree that a limiting instruction probably should have been given, if requested, with respect to the flight evidence, its absence was not plain error, *i.e.,* error "so clearly prejudicial to [Chavarria's] substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States, supra,* 362 A.2d at 709 (citations omitted). If the failure to give a limiting instruction did not amount to plain

error under *Watts,* then surely counsel's failure to request such an instruction cannot be said to raise "a reasonable probability that ... the result of the proceeding would have been different." *Strickland v. Washington, supra,* 466 U.S. 668, 104 S.Ct. at 2068, 80 L.Ed.2d 674.

The convictions of both appellants are therefore

*Affirmed.*

---

**8.** This court adopted the *Strickland* test in *White* v. *United States,* 484 A.2d 553, 558 (D.C.1984).