**Leon D. MORTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 13940.**

District of Columbia Court of Appeals.

Argued Dec. 11, 1979.

Decided May 30, 1980.

Dennis M. Hart, Washington, D. C., appointed by the court, for appellant.

Jay B. Stephens, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed, and John A. Terry and Harry R. Benner, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, NEBEKER and FERREN, Associate Judges.

NEBEKER, Associate Judge:

The appellant, Leon D. Morton, was convicted by a jury of first-degree murder while armed (D.C.Code 1973, §§ 22–2401, –3202), attempted robbery while armed (id., §§ 22–2902, –3202), and carrying a pistol without a license (id., § 22–3204). The appellant moved for a new trial within seven days after verdict. See Super.Ct.Cr.R. 33. He based the motion upon an allegation of newly discovered evidence (which we do not address) and a coerced jury verdict. He appeals the denial of this motion. We conclude that the chain of events at trial regarding the participation of a juror in the deliberations after her request to be excused because of her brother's death, succeeded by a *Winters*[1] jury instruction, created a sufficient possibility of a coerced verdict that deference to the trial court's decision to deny this motion is not possible. See *United States v. United States Gypsum Co.*, 438 U.S. 422, 462, 98 S.Ct. 2864, 2886, 57 L.Ed.2d 854 (1978). The judgment of conviction is reversed and the case is remanded.

## I

This case arose from a shooting of a robbery victim. The shooting occurred in open view on a street in Northwest Washington. The government produced several witnesses who testified as to their knowledge of the shooting and identification of the appellant from photo displays, slide presentations, lineup viewing, and in-court personal identifications.

The appellant presented a defense of mistaken identity and alibi. A defense witness, Mr. Walker, said that a person named "Shorty" did the shooting and that "Jo-Jo" was his accomplice. Upon cross-examination, it was disclosed that Mr. Walker had not seen the gunman's face and that he had chosen someone other than "Shorty" as the gunman at a lineup. In addition, the government brought both of these individuals into court for the jury to compare them to the appellant.

The appellant also presented four alibi witnesses. One of these, Miss Davis, stated that he was with her the night of the shooting. Under cross-examination she revealed that the appellant called her after he was arrested and said something about an acquaintance known as "Pig."

The government's rebuttal included evidence relating to the distance between the witnesses and the robbery, and testimony from Detective Schuler that he had overheard the appellant tell Miss Davis "that he had been with 'Piggy' at the Jet Lounge on the night of the offense. . . ."

## II

Appellant's trial lasted five days. The case went to the jury late on the last day of trial, at which time it deliberated for less than an hour. The jury returned the next day for deliberations which it interrupted with two different requests for information or clarification. The deliberations continued on the third day, when at 10:30 a. m., the court learned from the Marshal that the brother of one of the jurors had died the previous night and that she would like to be relieved as soon as possible to make funeral arrangements. The court discussed with counsel what should be done and after receiving no word of a verdict by 2:30 p. m., agreed that a note should be sent inquiring

1. *Winters v. United States*, D.C.App., 317 A.2d 530 (1974) (en banc).

of the juror whether she had anything to communicate to the court. At 4:05 p. m., the court received a note from the jury that it was unable to reach a verdict. The court discussed an anti-deadlock charge with counsel. Both agreed that considering the "complexity of the facts" the jury had spent a relatively small amount of time in deliberations to merit such a charge at that time. The court then discussed what could be done considering the juror's known preoccupation with her brother's death and her desire to make funeral arrangements. The juror was subsequently questioned concerning her ability to continue in the deliberations. We repeat in part the court's inquiry.

> THE COURT: All right, do you feel that you would be able to sit tomorrow or Friday?
>
> THE JUROR: Tomorrow or Friday? Well, if *I have to,* I would.
>
> THE COURT: Do you feel that you could continue to deliberate either tomorrow or Friday in a fair manner, without any undue pressure upon you and still be able to consider favorably upon the evidence?
>
> THE JUROR: I guess, I don't know. I think I would. I can't be positive.
>
> [Emphasis added.]

    *    *    *    *    *    *

The court continued by questioning her ability to appear.

> THE JUROR: Well, I'm sure I'll be able to make it. Really, I have been under emotional strain.
>
> THE COURT: All right, are there any questions either counsel wishes to ask?
>
> [PROSECUTION]: I just wonder if the juror were excused for tomorrow to take care of necessary plans, did she think she would be able to return on Friday?
>
> THE COURT: Or, do you think you would be able to sit comfortably for half of tomorrow?
>
> THE JUROR: Yes.

A verdict was not reached that day and the jury returned the following day. No verdict was reached in the morning and the court gave a *Winters* instruction over defense counsel objection at approximately 12:00 p. m. A guilty verdict was returned at 3:35 p. m.

■ The government argues that it is a discretionary decision whether to grant a motion for a new trial and that we must defer to the trial court's vantage point. While we might generally agree that a new trial motion is addressed to trial court discretion,[2] the circumstances of this case require application of a different standard. It is axiomatic that a defendant in a criminal proceeding has the right to a trial by his peers who are free to deliberate and make an independent personal judgment as to guilt. *Winters v. United States,* D.C.App., 317 A.2d 530, 535 (1974) (en banc) (Gallagher, J., concurring). If it appears from events extraneous to proof in the case (here, the death of the juror's brother) that a substantial possibility of a coerced verdict exists, neither the trial court nor this court may speculate it away. We conclude that a substantial risk of a coerced verdict necessitates, as a matter of law, a mistrial or a retrial depending on how the issue is raised. *See United States v. United States Gypsum Co., supra; Jenkins v. United States,* 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965).

■ We conclude that a substantial risk of a coerced verdict was present here. After the court learned that the brother of one of the jurors had died and that she wanted to be excused, it took no action until that afternoon. Then, the juror was questioned concerning her ability to continue deliberations. We think the trial court could take no assurance from the juror's answers to its questions that she could continue deliberations impartially. In the ultimate analysis, the juror asked to be relieved. Despite her expressed good intentions to attend to her jury duty, she protest-

---

2. The cases on which the government relies for their argument that abuse of discretion is the appropriate standard of review are based on requests for new trial due to newly discovered evidence. *Raymond v. United States,* D.C. App., 396 A.2d 975 (1979); *Poteat v. United States,* D.C.App., 363 A.2d 295 (1976).

ed that she was under emotional strain. These circumstances presented the court with sufficient possibility of coercion that it should have been alerted to the need to declare a mistrial if a verdict was not promptly forthcoming.

This already potentially coercive situation was compounded by permitting hours of further deliberation and the giving of the *Winters* instruction. We find no fault in the *Winters* charge per se and recognize its potential appropriateness in this case absent the personal problems of the juror. However, the timing of the instruction could have well implied that a verdict was being demanded before the juror would be excused to attend to her personal business. We cannot know whether the juror surrendered to the pressure to be free or another juror compromised views to accommodate the bereaved one. It is sufficient that the death of the juror's brother and the following events, created a substantial possibility of diverting the jury deliberations from the essential neutral and nondistracting atmosphere. With that risk, and because jury deliberations cannot be probed, a retrial is required as a matter of law. *See United States v. United States Gypsum Co., supra.*

Accordingly, the order denying the requested new trial is reversed, the judgment of conviction is vacated, and the case is remanded.

*So ordered.*