**Tracy VAN DYKE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 08–CF–1378.

District of Columbia Court of Appeals.

Argued Sept. 15, 2010.
Decided Sept. 1, 2011.

Joanne Vasco, Hyattsville, appointed by the court, for appellant.

Jay Apperson, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney and Roy W. McLeese III, Chrisellen R. Kolb, and Stephen J. Gripkey, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, REID,* Associate Judge, RETIRED, and STEADMAN, Senior Judge.

* Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

REID, Associate Judge, Retired:

Appellant, Tracy Van Dyke, was indicted for second-degree murder while armed[1] and a jury convicted him of the lesser-included offense of voluntary manslaughter while armed. The charge arose from an altercation between Mr. Van Dyke and the decedent, Daniel Baldwin. He argues for reversal on the grounds that the trial court: (1) abused its discretion by instructing the jurors to continue to deliberate, in response to their initial note stating they were deadlocked; (2) committed constitutional error when it communicated *ex parte* with the jury; and (3) erred by failing to respond to a juror's note reminding the court about the juror's inability to serve beyond the end of the day, and by simultaneously delivering a reasonable efforts instruction to the jurors following their second note indicating deadlock. He asserts that the combination of the court's errors created a substantial risk of a coerced verdict that requires reversal.

We hold that (1) the trial court's response to the jury's initial deadlock note did not constitute error; (2) the court's *ex parte* communication with the jury was harmless; and (3) the combination of the *ex parte* communication, the reasonable efforts instruction, and the manner and substance of the court's response to the individual juror's note, did not create a substantial risk of a coerced verdict.

## FACTUAL SUMMARY

The record reveals that on Thanksgiving Day 2004, Mr. Van Dyke and his wife, Angela Van Dyke, hosted Mr. Baldwin, and Vernetta Sampson for dinner. Ac-

1. D.C.Code §§ 22–2103, –4509 (2001).

cording to trial testimony, the evening began without incident: the four ate dinner, engaged in conversation, and watched the Van Dykes' wedding video. Subsequent to watching the video, however, the Van Dykes began to voice their concerns about Ms. Sampson's and Mr. Baldwin's illegal drug use; they questioned whether Mr. Baldwin was a good influence over Ms. Sampson. Mr. Baldwin and Mr. Van Dyke got into an argument and Mr. Baldwin cursed Mr. Van Dyke. Mr. Van Dyke asked Mr. Baldwin to leave the apartment and escorted him outside; Mr. Baldwin said: "[T]he next time you disrespect me, I'm going to kill you."

Approximately 10–15 minutes later, Mr. Baldwin returned to the apartment and requested to be let back inside. He apologized to Mr. Van Dyke, who acquiesced and let him in. Immediately after re-entering the apartment, however, Mr. Baldwin became angry again. Mr. Van Dyke again escorted him outside; Mr. Baldwin stated that "he was going to f* * * [Mr. Van Dyke] up." Shortly thereafter, Mr. Baldwin gained re-entry to the apartment and confronted Mr. Van Dyke in the kitchen.[2] He repeatedly asserted that Mr. Van Dyke had disrespected him. Mr. Baldwin rushed toward Mr. Van Dyke and punched him in the mouth, grabbed him by the neck, pushed and tackled him. They exchanged punches. Mr. Baldwin told Mr. Van Dyke: "I'm going to kill your b* * *h a* *."

At some point during the exchange Mr. Van Dyke grabbed a frozen bottle from the sink and repeatedly struck Mr. Bald-win in the head with it until it broke. After the bottle broke, Mr. Van Dyke flipped Mr. Baldwin over, got on top of him, and pinned him down by his forearms. Mr. Baldwin continued to struggle, kicking his feet and punching Mr. Van Dyke while threatening to kill him. Mr. Van Dyke remained on top of Mr. Baldwin for "a long length of time," in an effort to calm him down so that he "could get [him] some help." After some time, Mr. Baldwin began to decrease his resistance; he eventually fell into a deep snore. Mr. Van Dyke thought that Mr. Baldwin was sleeping and immediately dialed 911 and reported his injuries. Shortly thereafter, the police arrived and discovered Mr. Baldwin unconscious in the kitchen, not breathing and without a pulse; paramedics were unable to revive him.

## ANALYSIS

In essence, Mr. Van Dyke argues that the trial court abused its discretion and committed constitutional error in responding to jury notes during jury deliberations. We first set forth the factual context for the jury instruction issues.

### *Factual Context*

Following closing arguments, the trial judge instructed the jury on both second-degree murder while armed and voluntary manslaughter while armed. At Mr. Van Dyke's request, the court delivered Jury Instruction 2.401,[3] concerning the order of consideration of the charges. The court directed the jury to "first consider whether Mr. Van [D]yke is guilty of second-degree

---

**2.** Mrs. Van Dyke testified that Mr. Van Dyke let Mr. Baldwin in the apartment for the third time; however Mr. Van Dyke testified that he thought Mrs. Van Dyke let Mr. Baldwin into the apartment, but could not be certain how he gained re-entry.

**3.** All jury instructions referenced herein appear were from the fourth edition of the DISTRICT OF COLUMBIA STANDARDIZED CRIMINAL JURY INSTRUCTIONS (the "Redbook"). A fifth edition was released in 2009; however all of the relevant jury instructions appear exactly the same. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, (5th ed. rev.2009).

murder while armed ..." and "[I]f you find Mr. Van [D]yke not guilty, only then go on to consider voluntary manslaughter while armed."

The jury began deliberations on May 6, 2008 at 1:38 p.m., took a break for lunch, and continued to deliberate until 4:45 p.m. The jury deliberated on May 12, 2008 from 10:00 a.m. to 3:00 p.m., with a lunch break. Deliberations resumed on May 13th until 12:15 p.m. when the jury sent a note to the judge stating: "[t]he jury is deadlocked." The court reconvened at 12:33 p.m. but had to wait for Mr. Van Dyke to return before proceeding. The court noted its displeasure with his tardiness. The trial judge revealed his plan to send a note asking whether the jurors were deadlocked as to second-degree murder or voluntary manslaughter. Initially, defense counsel offered no objection to the judge's proposed response. The prosecution, how-ever, questioned whether the judge's approach would "necessarily ... give [the court] any information?" The trial judge responded by asking whether the parties agreed that a "reasonable efforts" instruction,[4] directing the jury to consider the lesser-included charge of voluntary manslaughter, would be appropriate should the jury indicate that it was deadlocked as to second-degree manslaughter.[5] Defense counsel responded that the note was a clear indication that the jury was unable to reach a verdict and moved for a mistrial on the ground that the proposed inquiry would unduly coerce the jury into delivering a verdict.

The prosecution opposed the mistrial, and maintained that the reasonable efforts instruction might be premature. The court proposed that it deliver the *Mize* instruction instead.[6] Defense counsel

4. CRIMINAL JURY INSTRUCTION 2.601 (5th ed. Rev.2009) sets forth several different instructions that a trial court may give when jurors cannot agree: (1) an initial instruction to deliberate further and to keep an open mind; (2) the *Mize* instruction which compliments the jury and offers suggestions that may be of help to the jury, see *Trapps v. United States*, 887 A.2d 484, 490–91 (D.C.2005); (3) three anti-deadlock instructions: (a) the *Thomas* instruction which is modeled on an American Bar Association standard, see *United States v. Thomas*, 146 U.S.App.D.C. 101, 108 n. 45, 449 F.2d 1177, 1185 (1971); (b) the *Winters* instruction which, in part, tells the jurors to listen to, respect, and ask themselves questions about the opinions of others, see *Winters v. United States*, 317 A.2d 530, 534 (D.C.1974) (en banc); and (c) the *Gallagher* instruction which is a modification of the *Winters* instruction, see *Winters, supra,* 317 A.2d at 539 (*Gallagher,* concurring); and (4) an instruction pertaining to a lesser-included offense where the jury has made reasonable efforts to obtain unanimous agreement on the greater offense without success, see *Powell v. United States,* 684 A.2d 373 (D.C.1996).

5. The court specifically stated: "If the answer is that we are deadlocked on the greater charge, then my question to both of you [is,] this precisely the point in time where the judge has the discretion to instruct them that if they have made reasonable efforts and have been unable to reach a verdict as to Count 1, as to the greater charge, well, second degree murder while armed, they may turn their attention to the voluntary manslaughter while armed?"

6. The *Mize* instruction can be found in Redbook Instruction 2.601(II):

First of all, I want to compliment you on carefully following my earlier instruction that whenever you send a note, you not mention how you are divided on an issue. I have no idea on what lines you are divided and what the issues may be that are dividing you.

I'm thankful that I do not know that, and my instruction not to reveal how you are divided continues unless and until you reach a unanimous verdict.

In addition, the court is not interested in a decision. What I am interested in is offering help to you if you think the court can be of help to you.

And when I say if the court can be of help to you, I may enlist the assistance of the

again moved for a mistrial, which the court denied. The court asked defense counsel how he would like to proceed; counsel once again moved for a mistrial, but also stated that if the court did not grant a mistrial, he preferred the *Mize* instruction but "without the language of soliciting information on where [the jury is] with respect to second degree murder." The government suggested that the court instruct the jury using Redbook Instruction 2.91, the initial instruction to be used when jurors cannot agree.[7] Defense counsel objected to one sentence—"I would expect that it would take some time to reach a resolution of this matter"—on the ground that it communicated to the jury the court's expectation of a verdict. The court agreed to omit the sentence from the instruction. During the actual reinstruction, however, the court began to state the ob-

jected-to language before being interrupted by defense counsel:

> Court: Good afternoon, ladies and gentlemen, your note obviously indicates that you have been unable to reach a unanimous decision at this time. This has been a relatively long trial, longer than many trials that we have at this courthouse. Th[ere] were a number of witnesses who testified and a substantial amount of a evidence received. I would expect that it would take some time to—
>
> Defense Counsel: Your Honor ...

The court promptly revised its instruction to exclude the remainder of the statement:

> Court: I would expect—well, it's not unexpected that you would be deliberating at this time. It's not unusual in cases such as this. As a result, I would

---

> attorneys for each side in trying to be of help to you.
> The goal here is not to force you to reach a verdict, or to suggest in any way what your verdict should be.
> I am proposing that it may be helpful for you in the privacy of your jury room to identify areas of agreement and areas of disagreement that you are having.
> If you care to make such identification, you may then wish to discuss the law and the evidence as they relate to those areas of disagreement.
> If you still have disagreement, I invite you but I do not require you to identify questions about the evidence or the final instructions of law regarding which you would like assistance from the Court or counsel.
> If you choose this option, then please list in writing, in as clear and simple language as you can fashion, where further assistance might help you in bringing about a verdict. In closing, I want to repeat that I do not wish or intend to force a verdict. I am merely trying to respond to your latest note. If you think this offer might be of assistance, then I think it would be wise to give it a try.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.601(II) (5th ed. rev.2009).

*See also Trapps, supra,* 887 A.2d at 490–91 & n. 6.

**7.** Instruction 2.91 was renumbered to 2.601 in the fifth edition of the Redbook, but is the same. It reads:

> Your note indicates that you have been unable to reach a unanimous decision at this time. [This has been a relatively long trial—longer than many trials we have in this courthouse. There were a large number of witnesses who testified and a substantial amount of evidence received, and I would expect that it would take some time to reach a resolution of this matter.] My best judgment is that you have been deliberating for a total of about [_____] [hours] [days], which is not unusual in cases such as this. As a result, I am going to ask that you deliberate further in this case and that you keep an open mind about the case with a view to listening to others and expressing your own point of view to see whether you can reach a unanimous decision. Please resume your deliberations at this time.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.91(I) (4th ed. rev.2008); *see also id.,* No. 2.601(I) (5th ed. rev.2009) (unchanged). The trial court estimated, at that point, that the jury had deliberated for eight hours.

ask that you go back and deliberate further in this case and that you continue to give it your best efforts. Please resume your deliberations at this time. Thank you.

Defense counsel did not raise any specific objection to the reinstruction, as delivered, and declared that "in a vacuum standing alone" the instruction was not coercive. Counsel expressed the view, however, that future instructions could become coercive: "[E]ach step may become more coercive." The court acknowledged counsel's concern about the cumulative effect of instructions, saying: "[L]et's work to avoid that here." The court instructed the parties to "[s]tay close by," because it expected another note from the jury and wanted to be able to respond quickly. The court complained that "[i]t took about a half an hour to get everybody back here [earlier]."

The transcript for May 13, 2008 notes, "case passed at 1:08 and recalled at 3:11 p.m." Apparently, at some time prior to 3:11 p.m., the trial judge had received two notes from the jury. One stated that the jury was "firmly deadlocked," while the other was a note from an individual juror reminding the court that she was not able to continue service beyond that day (May 13th). The notes read as follows:

From Juror 160 (foreperson): The jury remains firmly deadlocked.

From Juror 737 (individual juror): As previously notified I will be unable to serve on the jury after May 13, 2008. I have a wedding outside the U.S. and my flight is scheduled for Wednesday, May 14th at 8:15am.

After waiting twenty-five minutes, the trial judge decided to respond to the fore-

person's note before the arrival of the defendant, defense counsel, and government counsel. When the case was recalled at 3:11 p.m. after the arrival of the defendant and counsel, the judge read the notes he had received from the foreperson and Juror 737 and complained that with respect to the deadlock note, "I had to wait too long to get everyone here again." The judge informed the parties that he had sent a written communication responding to the deadlock note, that stated:

Members of the Jury: I have received your note. Without in any way revealing the manner in which the jury is deadlocked, please advise the court in writing whether the jury has reached a unanimous verdict on any count.

The jury had sent another note asking the judge to clarify whether "count" meant second-degree murder or voluntary manslaughter.[8] The judge had responded:

Jury members: My question is simply whether or not the jury has reached a unanimous verdict on second degree murder while armed and/or voluntary manslaughter while armed.

The judge gave the parties an opportunity to object and defense counsel raised his previous objections by "rest[ing] on the record [counsel] made earlier"—that the note indicated that the jury was deadlocked and further inquiry only served to coerce a verdict. The judge said that asking the jury for clarification was necessary for him to properly consider whether to instruct the jury to deliberate on voluntary manslaughter. He also stated that he did not believe that the inquiry invaded the jury's province and, having heard defense counsel's earlier arguments, there was "nothing that could have been said in here that would have caused [him] to respond

8. The jury's note stated: "Your Honor: Would you please clarify what you mean by 'count?' We are not clear as to whether

"count" means each of the two charges (2nd Degree Murder as well as Manslaughter)."

any differently." Counsel and the court discussed options in anticipation of the jury's next note. Defense counsel again moved for a mistrial and government counsel left the courtroom briefly to consult with someone.

Soon, the judge received the jury's answer to his second note:

> We are deadlocked as to the charge of second degree murder. We have not considered the charge of voluntary manslaughter pursuant to your directions because we have not reached a decision as to second degree murder.

Counsel and the judge discussed how to reply to the note. Defense counsel moved for another mistrial, which the government opposed and the judge denied. The discussion turned to the type of instruction that could be given—a *Gallagher* instruction, a *Winters* instruction or a *Powell* instruction.

Eventually, the judge determined that the *Powell* instruction was appropriate. When government counsel inquired about the other note, meaning the note from Juror 737, the judge replied: "We will deal with it after I send [the jurors] back[ ]." After summoning the jury, the judge said:

> Good afternoon, again. I have received your responses and your note. I have an instruction for you, ladies and gentlemen.
>
> I told you in my instructions and I reiterated on the verdict form that the process was for you to consider the count of second degree murder while armed and only if you reached a unanimous verdict of not guilty or guilty ... would you [then] go on to consider the charge of voluntary manslaughter while armed.
>
> You have informed me that you are deadlocked as to the charge of second degree murder while armed.

> Since I find that you have made reasonable efforts and are still unable to reach a verdict on the charge of second degree murder while armed, I instruct you at this time that you should go on nonetheless and consider the charge of voluntary manslaughter while armed.
>
> And to consider whether the Government has proven each element of that offense beyond a reasonable doubt.
>
> So I will ask you ... to return to the jury room to consider just that.
>
> I do have another note from a juror which I shall respond to when relevant as the day goes on. Thank you.

The jury retired to deliberate at 3:38 p.m. The judge broached the question of options if the jury did not reach a verdict by the end of the day: proceeding with eleven jurors or calling an alternate juror back to join the jury. Defense counsel suggested the option of having deliberations resume when Juror 737 returned from the wedding. The judge chose not to decide on an option until the need arose. Thirteen minutes after they left for the jury room, at 3:51 p.m., the jury sent a note stating that it had reached a verdict; it found Mr. Van Dyke guilty of voluntary manslaughter while armed.

### *Applicable Legal Principles*

 Our analysis is guided by the following legal principles. "It is axiomatic that a defendant in a criminal proceeding has the right to a trial by his peers who are free to deliberate and make an independent personal judgment as to guilt." *Morton v. United States*, 415 A.2d 800, 802 (D.C.1980) (citing *Winters v. United States*, 317 A.2d 530, 535 (D.C.1974) (en banc) (Gallagher, J., concurring)). Circumstances "creating a substantial risk of juror coercion," *Hankins v. United States*, 3 A.3d 356, 361 (D.C.2010), undermine the exercise of independent personal judgment

during jury deliberations. Hence, verdicts traceable to jury coercion "cannot stand." *Id.* (citing *(Charles) Smith v. United States,* 542 A.2d 823, 824 (D.C.1988)).

The issue of jury coercion often arises in the context of a jury verdict rendered shortly after the trial court has responded to jury notes during jury deliberations. In that context, "coercion of a verdict does not mean simple pressure to agree." *Id.* (citing *(Charles) Smith,* 542 A.2d at 824) (internal quotation marks omitted). "Rather, pressure to agree is impermissibly coercive when it is likely to force a juror to abandon his [or her] honest conviction as a pure accommodation to the majority of jurors or the court." *Id.* (citing *Winters, supra,* 317 A.2d at 532) (internal quotation marks omitted). To determine the coercive effect of the trial court's instructions to the jury during deliberations, we examine "all the circumstances," *Johnson v. United States,* 360 A.2d 502, 504 (D.C.1976), and we do so "from the jurors' perspective." *Hankins,* 3 A.3d at 361 (citing *Payne v. United States,* 932 A.2d 1095, 1106 (D.C.2007)); *see also Downing v. United States,* 929 A.2d 848, 861 (D.C.2007). "A substantial risk of a coerced verdict necessitates, as a matter of law, a mistrial or a retrial depending on how the issue is raised." *Morton, supra,* 415 A.2d at 802 (citations omitted). Generally, however, "a mistrial is subject to the broad discretion of the trial court and our review is deferential."

*Blackwell v. Dass,* 6 A.3d 1274, 1278 (D.C. 2010) (citing *Johnson v. United States,* 980 A.2d 1174, 1182 (D.C.2009)) (other citations omitted). Moreover, "[w]hether to give an anti-deadlock instruction when a jury reports itself at an impasse, and which instruction to give, are questions committed to the trial judge's discretion." *Hankins,* 3 A.3d at 361.

With respect to a trial judge's *ex parte* communication with the jury, *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), recognized the right of a defendant to be informed of communications from the jury prior to a judge's response. *Rogers* based that right on Federal Rule Crim. Proc. 43 which specifies, in part, that "the defendant must be present at ... (2) every trial stage, including jury impanelment and the return of the verdict...." *Id.* at 39, 95 S.Ct. 2091. Part of Super. Ct. R.Crim. P. 43(a) mirrors Fed. R. 43(a)(2): "The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict ...., except as otherwise provided by this Rule." [9] In a later case, *United States v. Gagnon,* 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), the Court expounded upon the extent of a constitutional right to be present where the confrontation of witnesses is not at issue:

9. In *United States v. Tureseo,* 566 F.3d 77 (2d Cir.2009), the Second Circuit reiterated the due process aspect of the right to be present and stated the relationship between this constitutional right and Rule 43:

> [T]he constitutional right to be present at one's own trial exists "at any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure." Rule 43 of the Federal Rules of Criminal Procedure reinforces this constitu-

tional right by providing that a criminal defendant has a right to be present "at every stage." *See* Fed.R.Crim.P. 43; [*United States v.*] *Fontanez,* 878 F.2d [33,] 35 [(1989)] (stating that Rule 43 was "explicitly intended to codify existing law concerning a defendant's constitutional and common law rights to be present throughout trial" (internal quotation marks and citation omitted)).

*Id.* at 83 (citations omitted).

The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, e.g., *Illinois v. Allen*, 397 U.S. 337 [90 S.Ct. 1057, 25 L.Ed.2d 353] (1970), but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. In *Snyder v. Massachusetts*, 291 U.S. 97 [54 S.Ct. 330, 78 L.Ed. 674] (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* at 105–106, 108 [54 S.Ct. 330]; *see also Faretta v. California*, 422 U.S. 806, 819, n. 15 [95 S.Ct. 2525, 45 L.Ed.2d 562] (1975). The Court also cautioned in *Snyder* that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record. 291 U.S., at 115 [54 S.Ct. 330].

*Gagnon*, 470 U.S. at 526–27, 105 S.Ct. 1482. Despite the fact that Rule 43 is rooted in a defendant's due process right to be present "at every stage of the trial," "a violation of Rule 43 may in some circumstances be harmless error...." *United States v. Toliver*, 330 F.3d 607, 611 (3d Cir.2003). Harmless error generally is governed by either the standard articulated in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946),[10] or the standard enunciated in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[11] Furthermore, "an *ex parte* communication [with the jury] by a judge may be considered harmless error where the communication cannot be said to have prejudiced the defendant." *United States v. Mejia*, 356 F.3d 470, 476 (2d Cir.2004) (citation omitted).

### Discussion

### The Response to the Jury's Initial Deadlock Note

We focus first on the trial court's response to the first note from the jury saying: "The jury is deadlocked." In response to the note and after consultation with government and defense counsel, the trial court gave the initial instruction set forth in Jury Instruction 2.601(I) which is best described as an instruction encouraging jurors to continue deliberations. Mr.

10. As the Court said in *Kotteakos:*

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.... We think it highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict.

*Id.* at 764–65, 776, 66 S.Ct. 1239.

11. In *Chapman* the Court declared:

> There is little, if any, difference between our statement in *Fahy v. Connecticut* [, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) ], about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

*Id.* at 24, 87 S.Ct. 824.

Van Dyke contends that "the instruction to continue deliberating was inappropriate" not only because "the jury had already deliberated 9 hours over a 2–day period before announcing deadlock," but also because of defense counsel's objection to one sentence which the trial court partially delivered to the jury—"I would expect it to take some time to—." He claims that this partial sentence within the initial encouraging instruction was coercive because "it signaled to the jury that the court expected a verdict." Hence, he argues, the trial court abused its discretion by not granting his motion for a mistrial. He likens the trial court's initial instruction in this case to that in *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965). There the Court held the trial court's instruction "[y]ou have got to reach a decision in this case" was coercive. The government asserts that Mr. Van Dyke failed to object to the partial sentence and agreed that the instruction was not coercive. Moreover, the government emphasizes that the jury not only continued to deliberate but remained deadlocked after the initial instruction was given.

■ Assuming, without deciding, that Mr. Van Dyke preserved the issue pertaining to the trial court's initial instruction, we are satisfied that the court's response to the jury's first note indicating deadlock did not create a substantial risk of juror coercion. In *Calaway v. United States*, 408 A.2d 1220, 1230 (D.C.1979), we examined the trial court's responses to jury notes and said that the substance of those responses boiled down to "please keep trying." *Id.* at 1229. Similarly, here the trial court's message in reply to the first deadlock note was to keep trying to reach a unanimous verdict, or as the trial court put it, "give it your best efforts." There was no hint of coercion in the instruction. Indeed, following the reinstruction, defense counsel and the trial court engaged in a brief exchange over the possibility of coercion. At one point, the court stated "the bottom line is that there is nothing in the least bit coercive about what I have just said and nobody is saying so." Defense counsel agreed stating, "[r]ight. It is not coercive in a vacuum standing alone." Although defense counsel raised concerns about *future* instructions having a potentially cumulative coercive effect on the jury, all parties agreed that the initial instruction, as delivered, was not coercive. Moreover, the jury remained deadlocked two hours after the reinstruction, which we have said is proof that a reinstruction was not coercive. *Johnson v. United States*, 360 A.2d 502, 504 (D.C.1976) (jury remaining deadlocked after *Winters* instruction meant instruction could not have been coercive).

In sum, the record demonstrates that the trial court's initial instruction upon notification of deadlock did not create a substantial risk of coercion. *Hankins, Calaway, supra.* It was an encouraging instruction that amounted to no more than "a temperate prod" to a jury that had not reached a unanimous decision. *Taylor v. United States*, 866 A.2d 817, 825 (D.C. 2005) (quoting *Powell, supra*, 684 A.2d at 380 (citation omitted)); *see also Green v. United States*, 740 A.2d 21, 30 (D.C.1999) ("An exhortation to the jury to continue deliberating, without more, has never been held by this court to approach an anti-deadlock instruction.") (citation omitted); *Dean v. United States*, 938 A.2d 751, 767 (D.C.2007) (judge's charge to continue deliberating with an open mind "w[as] neutral as to the effect of any coercive potential").

### The Trial Court's Ex Parte Communication With the Jury

For his second contention, Mr. Van Dyke argues that the trial court impermis-

sibly engaged in an *ex parte* communication with the jury. Based on *Rogers, supra,* and our Rule 43(a), we have held consistently that: "A defendant and his counsel have a right to be informed of all communications from the jury and to offer their reactions before the trial judge undertakes to respond." *(Michael) Smith v. United States,* 389 A.2d 1356, 1361 (D.C. 1978) (per curiam) (citing *Rogers,* 422 U.S. at 39, 95 S.Ct. 2091) (other citations omitted); *see also Cox v. United States,* 999 A.2d 63, 70 (D.C.2010); *Hallmon v. United States,* 722 A.2d 26, 27 (D.C.1998).[12]

■■■ Here, we can readily understand the trial judge's obvious frustration about the second delayed arrival of the defendant, and government and defense counsel's slow arrival after his admonition that they should "[s]tay close by" because he "expect[ed] another note of some kind." In addressing the earlier delayed arrival of the parties, the judge complained: "It took about a half an hour to get everybody back here today. Please make sure to check with [the courtroom clerk] as to when the jury is taking their lunch break so we can respond quickly." The judge's frustration

undoubtedly increased because "people were not picking up [the telephone] at [the] office" of one of the counsel. Notwithstanding our understanding of the judge's frustration, we are left with the fact, as the government states it, that: "In the absence of appellant and counsel, the trial court erred in responding to the jury's note that it 'remain[ed] firmly deadlocked' by writing a note asking whether the jury had reached a unanimous verdict on second degree murder and/or voluntary manslaughter."

Because we agree with the government that there is error on this record, the only remaining question is whether the error was harmless. The government recognizes that in this type of case we variously have applied the standard of harmlessness as articulated both in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) and in *Chapman, supra.* On the record in this case, we believe that the *Kotteakos* standard of harmlessness is appropriate;[13] we cannot say that at the time the trial court received the second deadlock note from the jury and Juror 737's note, that "the presence of [Mr. Van

**12.** In *Winestock v. United States,* 429 A.2d 519 (D.C.1981), we also declared that "appellant's right to be present at all stages of his trial is of constitutional dimension." *Winestock,* 429 A.2d at 529 (citing *Wade v. United States,* 142 U.S.App.D.C. 356, 360, 441 F.2d 1046, 1050 (1971)).

**13.** We applied a different standard in *Winestock v. United States,* 429 A.2d 519 (D.C. 1981): "[T]he standard by which to determine whether reversible error occurred ... is not whether the accused was actually prejudiced, but whether there is any reasonable possibility of prejudice." *Id.* at 529 (internal quotation marks and citation omitted). Furthermore, we declared, because "appellant's right to be present at all stages of his trial is of constitutional dimension, ... the United States must show that the error was harmless beyond a reasonable doubt." *Id.* (internal quotation marks and citations omitted). In

*Winestock,* on the first day of jury deliberations, the jury sent a note posing a question apparently relating to a transcript of a police officer's report or description of a robbery and a question pertaining to the defendant's statement made on the night of his arrest. The actual juror notes were lost. The trial judge communicated with the jury *ex parte* and inquired whether the jury had reached a unanimous decision on any of the counts. When the foreperson responded that the jury had reached a unanimous verdict on only the first count, the judge instructed the jury to report back the next morning and to continue with its deliberations. *Id.* at 528. We concluded that the error was harmless beyond a reasonable doubt. *Id.* at 529. Even if we applied the *Chapman* standard in this case, we would still conclude that the *ex parte* communication error in this case was harmless beyond a reasonable doubt.

Dyke was] a condition of due process to the extent that a fair and just hearing would [have] be[en] thwarted by his absence." *Gagnon, supra,* 470 U.S. at 526–27, 105 S.Ct. 1482.

■ As the government argues, at the time the court asked the jury if it had reached a decision on either second-degree murder or voluntary manslaughter, the judge had already heard and rejected Mr. Van Dyke's objection that the inquiry would communicate to the jury that the court expected a verdict. Upon his delayed arrival, the court gave Mr. Van Dyke the opportunity to assert any new objections. He declined, instead "resting on the record" that he previously made. Moreover, Mr. Van Dyke had requested, and the trial court had given during its final instructions before the jury began deliberating, an acquittal first instruction. We have held that the acquittal first instruction "bears within its own terms the possibility of a reasonable efforts reinstruction in the event of deadlock." *Taylor, supra,* 866 A.2d at 825. Therefore, it should have come as no surprise to defense counsel that the next step would be a "reasonable efforts" determination. Counsel and defendant not only were present when the jury communicated that it was "deadlocked as to the charge of second degree murder" but they also had the opportunity to participate in the discussion of the next response to the jury, that is, the response following the judge's *ex parte* communication. Under these circumstances, we conclude that the trial court's *ex parte* communication, by itself, in no way "created a

substantial risk of juror coercion," *Hankins, supra,* 3 A.3d at 361, and thus, the error was harmless because we can say "with fair assurance, ... that the judgment was not substantially swayed by the error," and "it [is] highly probable that the error had [no] substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos, supra,* 328 U.S. at 764–65, 776, 66 S.Ct. 1239.[14]

### The Combination of the Ex Parte Communication, the Reasonable Efforts Instruction, and the Trial Court's Response to the Individual Juror's Note

Mr. Van Dyke contends that "the injurious influence in this case is the cumulative effect of the trial judge's first inappropriate [initial] instruction, followed by its *ex parte* communications with the deliberating jury which implied that the court expected a unanimous verdict on one or the other of the charges, followed by another charge to consider the lesser offense." He asserts that the combination of the jury stating that it was "firmly deadlocked," Juror 737 simultaneously raising her availability concerns, the trial court's statement that it would address Juror 737's note "as it became relevant," the Court's concurrent *Powell* instruction, and the jury returning the guilty verdict in thirteen minutes, evidences that "deliberations could not have been conducted in the neutral atmosphere required for the jury to arrive at an uncoerced verdict." He declares that, "while the juror was worrying whether deliberations would be concluded that

---

**14.** In *United States v. Pineda,* 389 U.S.App. D.C. 146, 592 F.3d 199 (2010), the D.C. Circuit noted that its cases had stated the *Kotteakos* standard in three different ways: (1) "whether it is 'highly probable' an error had a 'substantial and injurious effect or influence in determining the jury's verdict' "; (2) whether the court could say with " 'fair assur-

ance ... that the judgment was not substantially swayed by the error' "; and (3) "whether an error had 'a substantial and injurious effect or influence in determining the jury's verdict[.]' " *Id.* at 200 (citations omitted). The *Pineda* panel settled on " 'the judgment was not substantially swayed by the error.' " *Id.*

day, the atmosphere during deliberations could not have been conducted in the neutral atmosphere required for the jury to arrive at an uncoerced verdict."

The government essentially treats the *ex parte* communication issue and the issue regarding Juror 737 separately. It acknowledges the trial court's error with respect to the *ex parte* communication with the jury but insists that "the error was harmless as appellant was in no way prejudiced by the communication." The government takes the position that Mr. Van Dyke waived the claim concerning Juror 737 "by acquiescing in the trial court's procedures," and that if this court considers that claim, it is subject to plain error review, and under that standard, Mr. Van Dyke cannot "establish prejudice." The government rejects Mr. Van Dyke's "speculation" about how Juror 737 reacted to the judge's statement that: "I do have another note from a juror which I shall respond to as the day goes on." Furthermore, the government highlights the fact that earlier, on May [1], 2008, the trial judge had told Juror 737 that she "should ... have no concern.... You will not be missing an important event out-of-town." And, the government argues that the trial judge's " 'reasonable efforts' instruction released the jury from its previous responsibility to continue deliberation on a charge concerning which the jury was deadlocked, and freed it to deliberate on the lesser-included charge[,]" about which "the jury never expressed any difficulty in resolving ..., as evidenced by its unanimous verdict rendered only thirteen minutes after being permitted to consider it."

We have concluded that the trial court's response to the jury's initial deadlock note did not constitute error, and we see no reason to re-visit that conclusion with respect to Mr. Van Dyke's cumulative error argument. We pause, however, to examine whether the jury's verdict of guilty as to voluntary manslaughter, rendered thirteen minutes after the trial court gave its reasonable efforts instruction and indicated that it would address Juror 737's note "as it became relevant," created a substantial risk that the verdict was coerced.

To provide context for this examination, we set forth part of the trial court's instructions regarding second-degree murder, voluntary manslaughter, mitigating circumstances, and self-defense. We also set forth what the trial court had told Juror 737 about her commitment to attend an overseas wedding.

The trial court instructed the jury as to the elements of second-degree murder while armed:

One, that Mr. Van Dyke caused the death of [Mr.] Baldwin.

Two, that at the time Mr. Van Dyke did so, he had the specific intent to kill or seriously injure [Mr.] Baldwin or acted in conscious disregard of an extreme risk of death or serious bodily injury to [Mr.] Baldwin.

Three, that there were no mitigating circumstances.

... [F]our, that Mr. Van Dyke did not act in self defense.

[And five], [t]hat Mr. Van Dyke was armed or had readily available a weapon.

The government must prove beyond a reasonable doubt that at the time of the offense Mr. Van [D]yke was armed with or had readily available a dangerous or deadly weapon....

With respect to voluntary manslaughter, the trial court asserted:

Voluntary manslaughter is a killing that would otherwise be second-degree murder, except that mitigating circumstances are present. Mitigating circumstances do not result [in] a verdict of not

guilty. But they reduce the level of guilt from murder to manslaughter.

The essential elements of voluntary manslaughter, each of which the government must prove beyond a reasonable doubt, are:

One, that Mr. Van Dyke caused the death of [Mr.] Baldwin.

Two, that at the time Mr. Van Dyke did so, he had a specific intent to kill or seriously injure [Mr.] Baldwin or acted in conscious disregard of an extreme risk of death or serious bodily injury to [Mr.] Baldwin.

Three, that Mr. Van Dyke did not act in self defense.

[And four], [t]hat Mr. Van Dyke was armed with or had readily available a dangerous or deadly weapon.

The court told that jury, in part, that "[m]itigating circumstances exist where a person acts in the heat of passion caused by adequate provocation"; and that "[h]eat of passion includes rage, resentment, anger, terror and fear." Moreover, [m]itigating circumstances also exist where a person honestly but unreasonably believes that he is acting in self-defense." The court explained, in part, that "[s]elf defense is a complete defense to second-degree murder and manslaughter," and that "[t]he government must prove beyond a reasonable doubt that Mr. Van Dyke did not act in self defense."

The availability issue of Juror 737 surfaced on May 1, 2008, the second day of trial. Before calling in the jury, the judge advised counsel of a note from a juror indicating an inability to serve as of May 14th. After summoning the jury, the judge discussed the projected schedule and stated: "One juror mentioned having a very important reason to be out of town starting on the 14th." After identifying the juror as number 737, the court spoke directly to her: "[Y]ou should have no . . . concern about that. That will not be an issue. You'll not be missing an important event out-of-town." The issue apparently did not come up again until the trial court received the note from Juror 737 on May 13th, reminding the court that she would "be unable to serve after May 13, 2008" due to "a wedding outside the US" and a flight "scheduled for Wednesday, May 14th at 8:15 a.m."

 Our review of the record satisfies us that even if we assume that Mr. Van Dyke preserved the precise issue regarding Juror 737,[15] Mr. Van Dyke's claim of jury coercion is unsupported. He posits, in essence, that the voluntary manslaughter verdict was coerced because of the juror's preoccupation with her trip the next morning, coupled with the court's reasonable efforts' instruction (given at 3:35 p.m.) that signaled to the jury the judge's expectation that a verdict would be handed down before the end of the day. He assumes that the voluntary manslaughter count could not have been decided "freely and fairly," in only thirteen minutes. We disagree.

When the jury returned to deliberate at 3:38 p.m. on May 13, 2008, it had already deliberated on the afternoon of May 6th, the morning and afternoon of May 12th, and the morning and part of the afternoon

---

**15.** *See Green v. United States,* 718 A.2d 1042, 1056 (D.C.1998) ("Objections to jury instructions must be specific enough to direct the judge's attention to the correct rule of law; . . . [a] defendant's failure to raise objections in the manner required by [Super. Ct.Crim. R.] 30 limits the scope of our review to plain error.") (citations omitted); *see also Jones v. United States,* 946 A.2d 970, 977 (D.C.2008) (counsel must inform trial judge "about the unique circumstance . . . highlighted on appeal as to why the charge would have tended to coerce a verdict . . .").

on May 13th. While the jury had not yet considered the voluntary manslaughter count, it clearly had focused on the elements of the second-degree murder count, some of which were identical for voluntary manslaughter. On the second-degree murder count, the jury obviously could not unanimously agree that there were no mitigating circumstances. Moreover, it is more likely than not that the jurors had considered self-defense since they had been instructed that self-defense is a complete defense to second-degree murder and voluntary manslaughter but they had not agreed unanimously to acquit Mr. Van Dyke on the second-degree murder charge. The fact that the jurors had not convicted Mr. Van Dyke of second-degree murder undoubtedly meant that at least some of them believed that mitigating circumstances existed. Thus, when the jurors were authorized to proceed to voluntary manslaughter, reaching unanimous agreement on voluntary manslaughter would not have required extensive deliberation.

Nor do we believe that the reasonable efforts instruction, as given by the trial judge, was a signal that the judge expected a verdict before the end of the day. When the trial judge discussed the schedule with the jurors on May 1, he contemplated that they would be able to deliberate on May 5th and 6th, but added that he could not "guarantee" that they would be through deliberating on May 6th, and that he would "tell [them] not to rush [their] deliberations because of some change in the schedule...." At the same time on May 1st, the judge reassured Juror 737 that she would not miss her "important event out-of-town."

Mr. Van Dyke relies heavily on our decision in *Morton, supra,* in support of his coerced verdict claim. There, on the third day of jury deliberations the Marshal in-

formed the court in the morning that a juror's brother had died the previous night and the juror had requested to be "relieved as soon as possible" so that she could tend to his funeral arrangements. 415 A.2d at 801. After consulting with counsel, the judge sent the juror a note, around 2:30 p.m. "inquiring ... whether she had anything to communicate to the court." *Id.* at 802. The court received a deadlock note from the jury around 4:00 p.m. The court questioned the juror as to whether she would be able to deliberate on the next day or the following day "without any undue pressure upon her ...?" She responded: "I guess, I don't know. I think I would. I can't be positive." She also said that she had "been under emotional strain." The court asked whether the juror thought she "would be able to sit comfortably for half of tomorrow?" She answered, "yes." *Id.* Eventually, the court gave a *Winters* anti-deadlock instruction over objection around 12:00 p.m. and the jury returned a guilty verdict at 3:35 p.m. *Id.* at 802, 803. We determined that there was "a substantial risk of a coerced verdict" because of the juror's response to the court's questions, including her statement that "she was under emotional strain,"; we said that "[t]his already potentially coercive situation was compounded by permitting hours of further deliberation and the giving of the *Winters* instruction." *Id.*

This case is quite different. The court already had assured Juror 737 that she would not miss the wedding. Moreover, (1) there is no record here that Juror 737 was under emotional strain; (2) no anti-deadlock instruction was given; and (3) rather than hours of deliberation following the court's reasonable efforts instruction in this case, the jurors reached a unanimous verdict fairly quickly following the instruction, and they had considered over a two-day period elements which were essential to reaching a unanimous verdict on volun-

tary manslaughter. Furthermore, unlike *Powell, supra,* there were no notes from the jury raising questions about the substance of the trial court's jury instructions, and even in *Powell,* where the court also gave a reasonable efforts instruction, we determined that the court's instruction "was not impermissible on the particular facts of [that] case." Similarly, the reasonable efforts instruction was not impermissible on the facts of this case. Moreover, we discern no link between the trial court's *ex parte communication* with the jury or the court's handling of Juror 737's note and the voluntary manslaughter verdict. In short, we reject Mr. Van Dyke's cumulative effect argument.

Accordingly, we affirm the judgment of the trial court.

*So ordered.*