Frank Leon JOHNSON, Appellant

v.

UNITED STATES, Appellee.

No. 10–CF–0003.

District of Columbia Court of Appeals.

Argued June 1, 2012.

Decided Aug. 30, 2012.

Amended Sept. 20, 2012.

Sloan S.J. Johnson, Public Defender Service, with whom James W. Klein and Jaclyn S. Frankfurt were on brief, for appellant.

Amanda J. Winchester, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time it was filed, Deborah L. Sines and Michelle D. Jackson, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and FERREN, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Following a jury trial, appellant Frank Leon Johnson[1] was convicted of first-degree premeditated murder while armed, second-degree burglary while armed, first-degree felony murder while armed, carrying a pistol without a license, and three counts of possession of a firearm during a crime of violence.[2] Following closing arguments and prior to jury deliberations, the trial judge granted the government's motion to replace a regular juror with an alternate juror, over appellant's objection. Appellant now challenges his convictions on the basis that replacement of the regular juror, without finding her "unable or disqualified to perform juror duties," was a violation of Super. Ct.Crim. R. 24(c), and therefore an abuse of discretion by the trial judge warranting reversal. We agree, reversing appellant's convictions and remanding this case for new trial.

## I. Factual Summary

On April 7, 2003, Reginald Brighthart was murdered in Apartment 201 of 2837 Robinson Place Southeast, Washington, D.C. ("Apartment"). Support for the government's case came chiefly from the testimony of James Roberston,[3] the sole eyewitness to decedent's shooting, who testified that he brought the decedent into the bathroom and restrained him, while appellant entered the Apartment through a bedroom window and proceeded to shoot decedent in the head several times.[4] Appellant presented no witnesses

---

1. Appellant was initially charged and convicted alongside co-defendant, Alfred Evans. However, Evans and appellant filed a joint motion for new trial, which was granted and resulted in the trial underlying the instant appeal, where appellant was tried individually.

2. D.C.Code §§ 22–2101 & –4502 (2001); D.C.Code §§ 22–801(b) & –4502 (2001); D.C.Code §§ 22–2101 & –4502 (2001); and D.C.Code § 22–4504(b) (2001), respectively. We need not address the issues of merger raised by appellant because we reverse and remand this matter for new trial.

3. Roberston frequently supplied drugs to decedent and used the Apartment as a "crack den."

4. Several other government witnesses testified to appellant and Roberston's involvement in the incident, including Darnell Eaglin, who was present in the Apartment immediately prior to the shooting and who discovered the decedent's body. Eaglin identified appellant and Roberston as the principal participants in decedent's shooting from a police photo array. However, a bizarre inconsistency arose from the testimony of Willamae Limes, occupant of the apartment next-door to Apartment

and chose not to testify at trial, instead relying on the theory that Roberston, as opposed to appellant, was responsible for decedent's murder. Further, defense counsel contended that Roberston, a prior perjurer and drug dealer testifying pursuant to multiple plea agreements, had manipulated other witnesses into blaming appellant for decedent's murder.[5]

At trial, the court invited jurors to submit written questions, which the judge would pose to the respective witness if he found the question to be appropriate.[6] Juror 223, who asked more questions than any of her peers, directed forty-one questions to Roberston focusing predominantly on his veracity and motivation for testifying against appellant, many of which were asked by the trial judge during the trial.[7] Juror 223 also submitted four notes to the trial judge and counsel, requesting clarification on several logistical issues. On one notable occasion, Juror 223's note requested an opportunity to "speak w[ith] a med[ical] prof[essional]" as she was finding it hard to "deal with the strong emotional reactions to evidence being presented."[8] After a brief colloquy between the judge, the parties and the juror about her concerns, the prosecutor expressed concern regarding the juror's ability to serve, highlighting that during earlier witness testimony, Juror 223 had been sitting with "her feet on the chair . . . hugging her feet and rocking," and during the prior conference, she had been sitting on the floor, hugging her knees to her chest. The judge permitted the prosecutor to keep a record "every time [she] noticed something" that concerned her regarding Juror 223, but declined to determine that the juror was unfit to serve. The following morning, the prosecutor again raised concern regarding Juror 223's ability to serve, highlighting that the juror had mentioned that she may have missed some testimony. The trial judge declined to take action at that time, and stated that he was, instead, trying to determine "whether or not this is very natural on the part of the juror or whether or not this is an effort to make sure she's an alternate."

Following closing arguments, and over defense counsel's objection, the government again moved to have Juror 223 replaced by an alternate juror, on grounds

201, who claimed that she never saw Roberston that night, identifying several other individuals, including appellant, as parties involved in the murder.

5. In 2007, Roberston pled guilty in federal court to charges of possession with intent to distribute cocaine and PCP, for which he was sentenced only to probation, provided he perform undercover buys to assist law enforcement. However, when testifying before the grand jury regarding the instant case, Roberston lied about his role in the murder and his probation was revoked. Roberston was then charged with conspiracy to commit decedent's murder, entered into a cooperation agreement and pled guilty to the charged offense. Roberston's sentencing had not been completed at the time of appellant's trial, and was dependent upon whether the government found that he provided substantial assistance in this case.

6. A majority of the jurors exercised this option, with only three jurors abstaining. Juror 223, appointed as a regular juror, asked more than eighty questions to witnesses through the trial, whereas Alternate Jurors 619 and 841 posed no questions at all.

7. For example, Juror 223 proposed the following question: "Since you lied so many times before, and you don't recall many of the details about what occurred on April 6 & 7, 2003, why should we believe we're hearing the truth from you now?" The record indicates that the trial judge did not ask the witness this particular question.

8. Juror 223 submitted notes requesting opportunities to review trial proceedings, including whether she could access a trial transcript and review her notes during breaks.

that: (1) Juror 223 was similar to a sleeping juror, who had "admittedly missed portions of testimony because ... things were going about in her head and she wasn't able to process this information;" and (2) Juror 223 "had trouble following [the court's] instructions," as she had taken her notebook with her outside the courtroom several times despite receiving instruction not to do so. Defense counsel objected, claiming that no "egregious, willful flaunting of the [court's] directives" had occurred. Though the trial judge disagreed with the basis behind the government's motion, he nonetheless granted the motion and replaced Juror 223 with Alternate Juror 619, stating:

> We have alternates for a reason. And in this case, I have to admit that [Juror 223] was unique, unique in terms of some of the issues raised that I have not encountered in all the years that I've been allowing jurors to take notes and all the years that I've been allowing jurors to ask questions. *I don't see that there's any, quote, misconduct. But I believe that I have the discretionary authority to make [Juror 223] the second alternate at this point, and so that's what I'm going to do over the defense objection.*

(Emphasis added). Immediately following this statement, defense counsel restated his objection and asked that the court voir dire the replaced juror to "make the record clear." The court denied this request, finding voir dire unnecessary, and excused, but did not discharge, Jurors 841 and 223 as first and second alternates, respectively.[9] The jury found appellant guilty of all charges, and this appeal followed.

## II. Analysis

■■■ Appellant contends that the trial court abused its discretion in replacing Juror 223, without finding that Juror 223 was either "unable" or "disqualified" from performing juror duties, as required under Rule 24(c).[10] Appellant further argues that such error was not harmless and requires reversal, pursuant to *Hinton v. United States,* 979 A.2d 663, 690 (D.C. 2009) (en banc). "We review the trial court's decision to replace a juror with an alternate for an abuse of discretion[,]" *Hobbs v. United States,* 18 A.3d 796, 800 (D.C.2011), first asking whether the trial court's replacement of a juror violated the requirements of Rule 24(c). *Hinton, supra,* 979 A.2d at 691. If so, we reverse only in accordance with the harmless error standard established in *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), requiring that we reverse appellant's conviction unless we can conclude, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Hinton, supra,* 979 A.2d at 691 (quoting *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239). The government carries the burden of proving that any error was harmless, and succeeds where it can show overwhelming evidence of guilt and "no reason apparent in the record to think the erroneously removed juror would have dissented[.]" *Hinton, supra,* 979 A.2d at 691–92. However, "when the evidence is not overwhelming, we would be more cautious about finding harmlessness merely because the record offers no insight into the replaced juror's

---

9. In accordance with the practices of the trial judge, the alternates were considered to be jurors, who could be recalled if necessary, until the point that the jury was discharged.

10. Rule 24(c), which governs the trial court's discretionary use of alternate jurors, states that "[a]n alternate juror, in the order called, shall replace a juror who, becomes or is found to be unable or disqualified to perform juror duties." Super. Ct.Crim. R. 24(c).

views of the evidence,'" *Hobbs, supra,* 18 A.3d at 801 (citation omitted), instead presuming that the erroneous action affected the verdict where the court "is in virtual equipoise as to the harmlessness of the error[.]" *Hinton, supra,* 979 A.2d at 691 (citation omitted).

■ In this case, the replacement of Juror 223 was erroneous.[11] The trial judge explicitly found that Juror 223 was not replaced for misconduct, instead replacing her on the erroneous principle that he had the "discretionary authority" to replace her without specific justification, over defense counsel's clear objection. Though the government suggests that the record supports the juror's removal based on the alternative Rule 24(c) grounds of inability to serve, and suggests that this might have been an implicit basis behind the trial judge's replacement of Juror 223, this argument is unpersuasive where the trial judge previously found such grounds insufficient for earlier removal of the juror. Moreover, though Juror 223's questions may have "seemed unusual or immaterial, they were not indicative of [her] incapacity to follow and understand the evidence or to communicate and deliberate rationally and fairly with the other jurors." *Hinton, supra,* 979 A.2d at 684. Finally, when defense counsel requested voir dire of Juror 223 to "make the record clear" prior to her replacement, the trial judge rejected the option, instead determining that such questioning would be unnecessary, despite strong guidance from *Hinton* to do so. We conclude that Juror 223's replacement was erroneously made, consistent with our conclusion in *Hobbs, supra,* 18 A.3d at 800, where the trial court replaced a juror "out of an abundance of caution," citing neither

Rule 24(c) nor applying the language of the Rule.

■ We cannot find such error to be harmless. Instead, we find ourselves at the threshold noted in *Hinton,* simply unable to "know what would have happened" had Juror 223 remained on the jury. *Hinton, supra,* 979 A.2d at 692. The government's evidence, though arguably sufficient to support a jury verdict of guilty, is not overwhelming. *See Hobbs, supra,* 18 A.3d at 801. Roberston, an admitted perjurer testifying pursuant to several plea agreements, provided the only eyewitness testimony at trial. More specifically, Roberston had lied to authorities, repeated the lies during his grand jury testimony in this case, and was an admitted drug dealer with significant influence over many of the other witnesses who lived in the apartment building. One such witness, Limes, who was in the neighboring apartment throughout the evening of the incident, first claimed not to have heard or seen anything related to the murder. However, upon threat of having her children removed from her custody, Limes conceded that she had seen several individuals that evening, including Evans,[12] though she adamantly claimed that she did not see Roberston—contrary to Roberston's own account. Similar inconsistencies were observed in the testimony of other witnesses, including Tyrone Knight, who was in the parking lot outside of the apartment building at the time of the incident, and, contrary to Roberston's account, did not see appellant run around the side of the building to enter through the window. Finally, the physical evidence presented at trial notably lacked a murder weapon, fingerprints or DNA evidence. Rather, the ballistics

---

11. In its brief, the government appears to concede this point, at least in part, stating "that the court may have based its decision on an incorrect legal standard."

12. Though Limes admitted to seeing Evans that evening, she did not refer to him directly and instead used a false name.

expert testified that at least three firearms were used throughout the course of the incident. On these facts, we cannot say the evidence of appellant's guilt was overwhelming.

Our inability to determine the effect of Juror 223's substitution is amplified when we consider that most of Juror 223's questions were directed at establishing Roberston's credibility—an issue essential to a case where Roberston was the sole eyewitness and where, at trial, the defense theory was that Roberston fatally shot the decedent. The government attempts to minimize the import of these questions and distinguish *Hinton* from the instant case, arguing that Juror 223's questions were neutral, clarifying inquiries, which offered no indication that she intended to acquit appellant or was skeptical of the government's case. The government further argues that any perceived skepticism likely arose, not from the content of the questions, but simply because such questions could not be similarly posed to defense witnesses in a matter where the defense presented no case; thus, there was no indication that Juror 223 intended to acquit appellant and her replacement was harmless. However, this argument fails to sufficiently distinguish *Hinton*, where any skepticism revealed in the replaced juror's questions was similarly unclear and where the juror's questions also centered upon a disputed factual issue central to the case's determination. *See Hinton, supra,* 979 A.2d at 691 (noting that a juror's testing of the government's case does "not necessarily mean he disbelieved it. And even if he

disbelieved it, his mind might have been changed in deliberations with his fellow jurors"). In those comparable circumstances, we concluded that, where the government's case is not overwhelming, we have not "eliminate[d] [our] doubt about whether the error influenced the jury's decision" and must reverse. *Id.* Therefore, we "cannot say with sufficient confidence that the outcome would have been the same had [Juror 223] remained on the jury[,]" and must reverse appellant's convictions.[13] *Hobbs, supra,* 18 A.3d at 802.

### III. Conclusion

For the foregoing reasons, we hold that the trial court's removal of Juror 223 constituted an abuse of discretion. We therefore reverse his convictions and grant him a new trial on all charges.

*So ordered.*

13. The government contends that, regardless of harmlessness, remand would be an appropriate alternate remedy to reversal, allowing the trial judge to "articulate its findings, apply[] the correct legal standard, and ... if necessary, conduct a more detailed inquiry of Juror 223 consistent with appellant's request at trial." This suggestion is supplemented by the government's reminder that *Hinton* was issued only two months prior to this trial and the trial judge may not have been aware of our holding and the constraints on Rule 24(c) identified therein. However, we did not grant such latitude to the court in *Hobbs,* and need not do so where "appellant is entitled to the application of the law as it exists at the time of appeal." *Hobbs, supra,* 18 A.3d at 800.