*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-304 and No. 19-CF-369

CALVIN ABNEY and SHAWNE I. PROCTOR, APPELLANTS,

v.

UNITED STATES, APPELLEE.

On Appeal from the Superior Court
of the District of Columbia
(CF3-11803-18 and CF3-9596-18)

(Hon. Marisa Demeo, Trial Judge)

(Argued September 23, 2021                    Decided April 28, 2022)

*Cecily E. Baskir* for appellant Calvin Abney.

*William R. Weaver* and *Brian J. Young*, with whom *Charles B. Wayne*, *David M. Bitkower*, and *Julian J. Ginos* were on the briefs, for appellant Shawne Proctor.

*Mark Hobel*, Assistant United States Attorney, with whom *Michael R. Sherwin* and *Channing D. Phillips*, Acting United States Attorneys at the time, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *John P. Mannarino*, *Gauri Gopal*, and *Alyse Constantinide*, Assistant United States Attorneys, were on briefs, for appellee.

Before GLICKMAN, BECKWITH, and MCLEESE, *Associate Judges*.

MCLEESE, *Associate Judge*:  Appellants Calvin Abney and Shawne Proctor challenge their convictions for armed robbery and related offenses.  We vacate and remand.

**I.**

The evidence at trial was as follows.  Mr. Abney and Mr. Proctor worked together at a moving company.  Beginning around April 2018, Mr. Abney and Mr. Proctor texted each other, using slang, to refer to guns and to possible plans to rob drug dealers.  On June 8, 2018, they called or attempted to call each other numerous times.

The same day, Mr. Proctor's cousin contacted Daijan Green-Ashe, who was an old friend of Mr. Proctor's, and said that Mr. Proctor wanted to talk to Mr. Green-Ashe.  Mr. Green-Ashe called Mr. Proctor, who said that he needed some marijuana.  Mr. Green-Ashe agreed to meet Mr. Proctor in Southeast D.C. to sell Mr. Proctor marijuana.  Mr. Green-Ashe's friend Joshua Tucker drove Mr. Green-Ashe to meet Mr. Proctor.

After exchanging messages with Mr. Proctor about the location of the meeting, Mr. Green-Ashe parked behind a black Dodge Challenger that was outside

an apartment building. Mr. Proctor came out of the building with several men whom Mr. Green-Ashe did not recognize and told Mr. Green-Ashe that it was unsafe to make the sale near the building. Mr. Proctor then signaled for Mr. Tucker to follow the Challenger, which Mr. Proctor and another man then entered. The Challenger was following a small silver car. Mr. Green-Ashe was not suspicious at this point, because he considered Mr. Proctor to be a friend.

After driving some distance, the cars stopped. Mr. Proctor got out of the Challenger and got into the back seat of Mr. Tucker's car. Mr. Green-Ashe handed Mr. Proctor the marijuana he planned to sell Mr. Proctor. After inspecting the marijuana, Mr. Proctor called someone from his cell phone. Seconds later, Mr. Abney got out of the Challenger and into the back seat of Mr. Tucker's car.

Two men with guns then approached Mr. Tucker's car. Mr. Abney also pulled out a gun, pressed its barrel against Mr. Green-Ashe's shoulder, and demanded money. Mr. Proctor grabbed Mr. Tucker's arms, pinning Mr. Tucker to the back of his seat. Mr. Green-Ashe said he had no money, and Mr. Abney hit Mr. Tucker in the head with his gun. After a struggle, Mr. Tucker and Mr. Green-Ashe fled on foot. Mr. Green-Ashe saw police officers and told them that his friend had been kidnapped.

When Mr. Proctor was arrested not quite three weeks later, the police seized a cell phone from his pocket. A search of the cell phone turned up messages between Mr. Proctor and Mr. Green-Ashe setting up the marijuana deal; a picture of Mr. Proctor with a gun that resembled one of the guns used in the robbery; a text message by Mr. Proctor less than two hours after the robbery using slang to suggest that Mr. Proctor had some new marijuana; a text message several days after the robbery referring to giving someone a knot on the head; pictures of Mr. Abney, who matched Mr. Green-Ashe's description of the second man to get in Mr. Tucker's car; and the previously mentioned texts between Mr. Abney and Mr. Proctor from April 2018 to June 2018.

Cell phone records placed Mr. Abney and Mr. Proctor in the vicinity of the robbery at the time of the robbery.

## II.

Mr. Abney and Mr. Proctor argue that the trial court erred in refusing to replace a juror who had raised concerns about travel plans during trial and deliberations. We agree, and we therefore vacate the convictions and remand the cases to the trial court.

## A.

The jury was selected on December 13th, and the trial court at that point expected the trial to last six to seven days. The trial took longer than expected, however, and the United States did not rest its case until December 28th. The next day, Juror 7 sent the trial court a note stating that he had long-standing plans to be in California from January 7th through January 16th. The defense moved to replace Juror 7 with an alternate, because Juror 7 might get anxious if deliberations ran long. The trial court denied the motion, predicting that the jury would have enough time to deliberate before Juror 7 had to leave for his trip. The trial court informed Juror 7 that the note had been received and that Juror 7 would continue to serve as a juror.

The trial again took longer than the trial court had expected, and the jury did not start deliberating until January 2nd. On the afternoon of January 3rd, defense counsel expressed concern about Juror 7's travel plans, given that the next day was the last day of deliberations before Juror 7 was planning to depart. Defense counsel asked the trial court to inquire of Juror 7, but the trial court declined to do so.

The next morning, Juror 7, who was the foreperson, sent the trial court a note asking whether the jury had to be unanimous on all counts before returning a verdict

on any count.  The defense again argued that Juror 7 should be replaced with an alternate because of the pressure Juror 7 might be feeling to render a speedy verdict to avoid missing his trip.  The trial court declined to replace Juror 7, stating that it could excuse a juror after deliberations have begun "only when extraordinary circumstances and just cause are present."  Stating that the jury seemed to be deliberating with "due attention," the trial court concluded that Juror 7's travel plans did not amount to extraordinary circumstances and just cause.

Juror 7 sent the trial court two further notes that afternoon.  The first note brought up Juror 7's travel plans again:

> Your Honor, As mentioned in a juror's note last week I can not be in court on Monday.  I have a 2 p.m. flight to California and am scheduled to be out of town until January 17.  My presence is especially required as I am meeting my brother to do a backpacking trip in the desert and I have supplies that he needs and is relying on.  Additionally, I do not feel that, insofar as I have the power to decide, that I can let him enter the desert for 6 days on his own.  He is my brother.  I am very sorry for this inconvenience but the trip has been planned for [approximately] 6 months.

The second note, which was sent out thirteen minutes later, stated that the jury had reached a unanimous verdict on five counts.

The defense renewed the request to replace Juror 7 with an alternate. In support of that request, the defense pointed out that Juror 7's note stated that Juror 7 could not be in court on Monday. The defense further argued that the note and the surrounding circumstances, including the jury's difficulty in reaching a verdict, indicated that Juror 7's travel plans were affecting Juror 7's ability to deliberate impartially. In the alternative, the defense requested that the trial court at least inquire of Juror 7.

The trial court declined to replace Juror 7 with an alternate and declined to question Juror 7. In explaining its decision, the trial court reiterated its prior ruling that Juror 7's travel was not an "extraordinary circumstance" that permitted Juror 7's removal from the jury. The trial court also stated that nothing in the record showed coercion or that Juror 7 would not be impartial.

The trial court took a partial verdict of acquittal on some counts and guilt on other counts. After excusing the other jurors, the trial court explained to Juror 7 that the court could not release him from jury duty because his travel plans did not "qualify in the law as extraordinary circumstances." In response, Juror 7 asked the trial court to give him a note stating that the court would not excuse him from jury service, so that Juror 7 could use the note in communicating with his brother.

On the morning of Monday, January 7th, the jury returned a note stating that it had reached a unanimous verdict on two of the remaining four counts but was deadlocked on the others. The trial court took a partial verdict in which the jury found Mr. Abney and Mr. Proctor each not guilty on two counts. The trial court then gave the jury an anti-deadlock instruction and sent the jury back for further deliberations on the two remaining counts. Around 1 p.m., about an hour before Juror 7 had been scheduled to leave on his trip, the jury found Mr. Abney and Mr. Proctor both guilty on the last two counts.

**B.**

"When a defendant exercises [the] right to a jury trial, the jury's verdict will have legitimacy only if it is the product of unanimous decision making, devoid of coercion." *Callaham v. United States*, 268 A.3d 833, 841 (D.C. 2022). We give some deference to "the trial judge's on-the-spot perception of whether a juror was coerced." *Leak v. United States*, 77 A.3d 971, 979 (D.C. 2013) (internal quotation marks omitted).

Claims of juror coercion "must be evaluated in context and with regard to all of the circumstances." *Coley v. United States*, 196 A.3d 414, 420 (D.C. 2018)

(internal quotation marks omitted). We consider "the inherent coercive potential of the situation before the [trial] court" and whether the actions of the trial court "exacerbated, alleviated or were neutral with respect to coercive potential." *Id*. (internal quotation marks omitted). Our inquiry "focuses on probabilities, not certainties." *Id*. (internal quotation marks omitted).

We conclude that there was a substantial risk of juror coercion in this case by the time the trial court took the first verdicts on January 4th. By that point, (1) Juror 7 had several days earlier expressed concern about his trip; (2) the trial court had simply required Juror 7 to continue sitting; (3) the trial had run longer than the trial court had expected, so that the jury did not start deliberating until January 2nd, only three business days before Juror 7's planned departure; (4) on January 4th, the last day of deliberations before his planned departure, Juror 7 had sent a note asking about partial verdicts, which suggested that the jury might be having some difficulty reaching unanimous verdicts on all counts; and (5) that same day, Juror 7 had sent another note that (a) emphasized the importance of his travel plans (explaining that Juror 7 did not want to leave his brother alone in the desert without proper supplies) and (b) flatly stated that Juror 7 could not be in court for the next day of deliberations.

In our view, those circumstances raised a substantial risk that Juror 7 was feeling strong pressure to complete deliberations before his planned departure. As we have previously recognized, a juror's "ability to deliberate fully and fairly [can be] compromised" by "inflexible travel plans." *Hinton v. United States*, 979 A.2d 663, 680 (D.C. 2009) (en banc) (citing *United States v. Nelson*, 102 F.3d 1344, 1349 (4th Cir. 1996) (upholding trial court's decision to replace two jurors with alternates, where jurors had travel plans and "might be influenced by the pressure of completing deliberations and reaching a verdict before it became time for [the] jurors to leave")).

We also conclude that the trial court's actions up to the point of taking the first verdicts did not dispel or alleviate the risk of coercion. The trial court's response to Juror 7's first note was simply to indicate that the note had been received and, without explanation, to require Juror 7 to continue to sit. Juror 7 might well have understood the trial court's response to his first note as a "refusal to address [his] difficulty and provide [him] with any guidance at all – exacerbating rather than reducing the risk of a coerced verdict by seeming to leave [him] with no alternative" but to try to ensure that a final verdict was rendered before he was scheduled to leave for his trip. *Coley*, 196 A.3d at 424. When the trial ran unexpectedly long and the date of Juror 7's planned trip approached, defense counsel asked the trial court to at least inquire into whether Juror 7 could decide the case impartially. The trial court

declined to do so. On the last day of deliberations before the planned trip, Juror 7 sent out notes inquiring about partial verdicts, again raising (in emphatic terms) concerns about his upcoming trip, and then reporting partial verdicts. Defense counsel again asked the trial court to at least inquire, and the trial court again declined to do so. Such inquiry, however, can be essential to determining whether jurors can be fair and impartial. *Cf., e.g.*, *Al-Mahdi v. United States*, 867 A.2d 1011, 1018-19 (D.C. 2005) (where impartiality of juror has "plausibly" been called into question, trial court should investigate circumstances and impact on juror).

The risk of coercion only increased thereafter. The trial court flatly told Juror 7 that he was required to continue; the jury reported additional partial verdicts; the trial court gave an anti-deadlock instruction; and the jury returned its final verdicts an hour before the planned start of Juror 7's trip.

Given the foregoing circumstances, we conclude that the record reflects a substantial risk of juror coercion that was not dispelled or alleviated by the actions of the trial court. We recognize that we owe some deference to the trial court's assessment of the circumstances. *Leak*, 77 A.3d at 979. Even granting that deference, however, we disagree with the trial court's assessment. The trial court suggested that "nothing in the record" showed coercion, but we conclude otherwise

for the reasons that we have stated. We also note the parties' agreement that the trial court applied an incorrect legal standard: the requirement of "extraordinary circumstances" applicable under Super. Ct. Crim. R. 23(b) before a trial court can permit a jury of eleven jurors to return a verdict, rather than the standard applicable to the replacement of a juror with an alternate under Super. Ct. Crim. R. 24(c) (juror must be "unable to perform" or "disqualified from performing" duties). We need not, and therefore do not, express a view about the precise nature of the difference, if any, between those two standards. Finally, we note that the trial court's focus appeared to be on whether a juror's desire to take a trip is a good reason to excuse the juror. We have no quarrel with the trial court's general view that, in and of itself, a juror's desire to take a trip is not necessarily a basis to remove the juror. In some cases, however, such a desire can raise substantial concerns about the juror's ability to decide a case free from undue pressure to return a speedy verdict. In our view, this is such a case.

We are not persuaded by the contrary arguments of the United States. First, the United States suggested at oral argument that affirmance in the present case is supported by *Van Dyke v. United States*, 27 A.3d 1114 (D.C. 2011). We disagree. *Van Dyke* resembles this case in that it also involves a juror who was concerned that deliberations might interfere with travel plans. *Id.* at 1120. *Van Dyke* differs from

this case, however, in a critical respect: the trial court in *Van Dyke* assured the juror that the juror would be permitted to take her trip. *Id.* at 1129. In light of that assurance, there was no substantial reason to believe that concern about the trip would have a coercive effect on the juror's deliberations. *Id*. at 1129-30

Second, the United States points to three circumstances in the present case that it contends reduced the risk that the verdicts might have been the product of coercion: the polite tone of Juror 7's notes and response in open court; the mixed verdicts returned by the jury; and the unanimous jury polls. We agree that those circumstances are relevant, but we do not view them as reducing the risk of coercion to an acceptable level.

On the first point, we view Juror 7's second note as rather emphatic, because that note flatly declared that Juror 7 could not continue to deliberate after January 4th. It is true that Juror 7 was polite when the trial court informed him that he would have to continue to sit. We place little weight on that circumstance, however, given that jurors may well feel reluctant to express disagreement in response to a judge's ruling. *See, e.g.*, *Wheeler v. United States*, 930 A.2d 232, 243-44 (D.C. 2007) ("[A] judge's influence on the jury is necessarily and properly of great weight and his or

her lightest word or intimation is received with deference, and may prove to be controlling.") (brackets and internal quotation marks omitted).

On the second point, the mixed verdict in this case seems ambiguous on the question of coercion. A mixed verdict may reflect thoughtful deliberations but may also reflect a compromise to reach a verdict more quickly. *Compare, e.g.*, *Callaham*, 268 A.3d at 845 n.12 (mixed verdict can reflect "compromise verdict born of coercion"), *with, e.g.*, *Brown v. United States*, 818 A.2d 179, 187-88 (D.C. 2003) (mixed verdict strongly suggests absence of coercion).

On the third point, the unanimous jury polls do not shed significant light on whether Juror 7 was feeling internal pressure to complete deliberations before his trip.

Because "a substantial risk of juror coercion . . . was not effectively addressed, we cannot find the error[] to have been harmless." *Coley*, 196 A.3d at 425; *see id.* at 423 (reversing convictions because trial court did not adequately address risk that juror may have "felt pressured to surrender [her] convictions"). We therefore cannot affirm the convictions in this case on the current record. The United States argues, however, that we should not vacate the convictions outright and instead should

remand the case for an after-the-fact inquiry into whether Juror 7 was able to deliberate fairly and impartially. That argument seems difficult to reconcile with this court's statement that "a defendant is entitled as a matter of law to reversal of [the] conviction on appeal if the record reveals a substantial risk of a coerced verdict." *Id.* at 420 (internal quotation marks omitted).

As the United States points out, however, we once remanded a case for an after-the-fact inquiry, rather than vacating outright, where a juror had allegedly been sleeping during trial and "we were unable to discern the factual foundation for the trial court's decision to leave [the juror] on the jury." *Lester v. United States*, 25 A.3d 867, 870 (D.C. 2011). We assume for current purposes, without deciding, that we might have the authority in an appropriate case to remand, rather than vacate outright, for an after-the-fact inquiry into juror coercion. In our view, however, this would not be an appropriate case in which to exercise any such authority. Over three years have passed since trial, which would make an after-the-fact inquiry difficult. *Cf., e.g., Robinson v. United States*, 878 A.2d 1273, 1288-91 (D.C. 2005) (in exercising discretion to reverse rather than remand for after-the-fact factual inquiry, court notes, among other things, difficulties posed by passage of time). Moreover, an after-the-fact inquiry might raise challenging questions about the permissible scope of the inquiry into Juror 7's state of mind and the effect of that state of mind

on the jury's deliberations and verdict. *See generally, e.g.*, *Al-Mahdi*, 867 A.2d at 1019 n.14 (noting limits on post-verdict inquiry into juror's state of mind and jury deliberations). Under the circumstances, we decline to remand for an after-the-fact hearing. *Cf. Johnson v. United States*, 50 A.3d 1050, 1055 n.13 (D.C. 2012) (declining to remand for after-the-fact inquiry to question juror to determine, under proper legal standard, whether trial court properly replaced juror with alternate).

We therefore vacate all of the convictions and remand the case to the Superior Court.

## III.

Although we have already concluded that the convictions must be vacated, we exercise our discretion to consider several issues that are likely to arise on remand. *See, e.g.*, *Fleming v. United States*, 224 A.3d 213, 224 (D.C. 2020) (en banc) ("Since a remand is necessary, we deem it appropriate to address certain issues that are likely to arise on remand.") (internal quotation marks omitted).

**A.**

Mr. Proctor contends that the evidence obtained in the search of his cell phone should have been suppressed, because the search was unreasonable under the Fourth Amendment. We conclude that the evidence was admissible under the good-faith exception to the exclusionary rule. *See generally, e.g.*, *United States v. Leon*, 468 U.S. 897 (1984) (evidence obtained pursuant to warrant is not subject to exclusion if officers executing warrant reasonably relied on judicial officer's approval of warrant).

Under the good-faith exception, "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon*, 468 U.S. at 918. Suppression of evidence will be justified, however, if the police could not reasonably have relied upon the judicial officer's approval of the warrant. *Id.* at 923. For example, suppression is appropriate if the affidavit in support of the search warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or if the warrant was "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.*

(internal quotation marks omitted). We assess the reasonableness of the officers' reliance in light of the law at the time of the warrant's issuance and execution. *E.g., Witaschek v. District of Columbia*, 254 A.3d 1151, 1157 (D.C. 2021).

**1.**

When officers arrested Mr. Proctor eighteen days after the robbery, they recovered a cell phone from one of his pockets. Officers obtained a warrant to search that cell phone for evidence of the robbery. The affidavit in support of the warrant described the robbery and explained that four persons participated in the robbery. The affidavit also described the evidence connecting Mr. Proctor to the robbery. That evidence included that Mr. Proctor had contacted Mr. Green-Ashe before the robbery, "via cellphone," to arrange a meeting. The affidavit also explained the affiant's basis for believing that the cell phone would contain evidence of the robbery. Specifically, based on his training and experience, the affiant stated that persons committing crime in the District of Columbia (1) often use cell phones in ways that reveal their location and activities before, during, and after criminal activity, including GPS data, internet searches, and texts and emails to associates; and (2) often store and share images or recordings of weapons or other contraband.

The search warrant authorized the officers to search the cell phone for

> data, in whatever form, including but not limited to Communications (such as text messages, emails, and social media messages), photographs and videos, indicia of the cellular phone owner's associates and their contact information (contained in the address book and information sections of the phone) as well any other information that would help establish ownership, location information, that is evidence of the carjacking / robbery and / or the location, motive, intent, or associates of the owner of the phone at the time of the carjacking / robbery . . . .

The police executed the warrant and, as previously noted, recovered evidence linking Mr. Proctor to the robbery and helping to identify Mr. Abney.

**2.**

Mr. Proctor argues that the warrant was not supported by probable cause. We do not decide that issue. Instead, we rule more narrowly that the officers could reasonably have relied on the judge's decision to issue the warrant.

"The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Wade v. United States*, 173 A.3d 87, 92 (D.C. 2017) (internal quotation marks omitted). "Although an officer must have more than mere suspicion that criminal activity has taken place, only the probability, and not a prima facie

showing, of criminal activity is required to establish probable cause." *Id.* (internal quotation marks omitted). Probable cause "does not demand any showing that such a belief be correct or more likely true than false." *West v. United States*, 100 A.3d 1076, 1087 (D.C. 2014) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion) (internal quotation marks omitted)); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (affidavit in support of search warrant must provide "fair probability that contraband or evidence of a crime will be found in a particular place"). Probable cause may rest on "common-sense conclusions about human behavior." *Gates*, 462 U.S at 231 (internal quotation marks omitted).

It is undisputed that the affidavit in support of the search warrant established probable cause that Mr. Proctor participated in the robbery. In our view, officers could reasonably have believed that the affidavit also established probable cause that the cell phone contained evidence of the robbery. The police seized the cell phone from Mr. Proctor's possession when they arrested Mr. Proctor eighteen days after the robbery. As previously noted, the affidavit stated that, based on the affiant's training and experience, persons who commit crimes often use their cell phones in ways that leave evidence of crime on those phones, including information about the offender's location on or around the date of the crime; internet searches relating to the crime; images relating to or depicting the crime; communications with associates

relating to the crime; and statements to others about the crime. The affidavit further stated that four persons committed the robbery. Finally, the affidavit stated that, on the date of the robbery, Mr. Proctor contacted the complaining witness "via cellphone."

This court has not yet addressed whether probable cause to search a cell phone exists in circumstances analogous to those of the present case, so no decision of this court would have provided clear guidance in 2018, when the search warrant in this case was issued and executed. *See generally Witaschek*, 254 A.3d at 1157 (assessing reasonableness of officers' conduct in light of law at time of warrant's issuance and execution). As of 2018, however, a number of other courts had either found probable cause or upheld cell-phone search warrants issued in analogous circumstances. *See, e.g.*, *Stevenson v. State*, 168 A.3d 967, 974-78 (Md. 2017) (affidavit permitted issuing magistrate to find probable cause that cell phone seized from suspect contained evidence of robbery committed previous day; affidavit stated that, in officer's experience, robbery suspects "sometimes" use cell phones to take pictures of or send messages about their offenses); *Moats v. State*, 168 A.3d 952, 961-64 (Md. 2017) (affidavit supported reasonable inference that cell phone recovered from suspect contained evidence of alleged drug use and sexual assault that occurred over two weeks earlier; affidavit established probable cause that suspect had provided

drugs to others, drug distribution is offense that requires communication among multiple participants, and affidavit recounted officer's conclusion, based on training and experience, that there was probable cause to believe that evidence of drug dealing and sexual assault would be on cell phone); *United States v. Gholston*, 993 F. Supp. 2d 704, 720 (E.D. Mich. 2014) (affidavit established probable cause to believe that cell phone seized from suspect would contain evidence of robbery committed nine days earlier; "[A] number of courts have found that an affidavit establishes probable cause to search a cell phone when it describes evidence of criminal activity involving multiple participants and includes the statement of a law enforcement officer, based on [the officer's] training and experience, that cell phones are likely to contain evidence of communications and coordination among these multiple participants.") (citing cases). There also was authority pointing in the opposite direction. *See Commonwealth v. White*, 59 N.E.3d 369, 374-78 (Mass. 2016) (warrant to search cell phone recovered from suspect three days after robbery/shooting was not supported by probable cause; inadequate nexus shown based solely on information that offense was committed by multiple offenders and statement that, based on officer's training and experience, cell phone likely contained evidence of offense).

Given the state of the case law in 2018, we hold that the officers could reasonably have believed that the affidavit established probable cause to search the cell phone for location information and other evidence, such as communications with Mr. Green-Ashe and among the participants in the robbery. We reiterate the narrowness of our ruling. We need not and do not express any view as to whether the affidavit actually did establish probable cause.

We are not persuaded by Mr. Proctor's further arguments. First, Mr. Proctor argues that the affidavit does not clearly state that Mr. Proctor used his cell phone to contact Mr. Green-Ashe on the night of the robbery. Rather, Mr. Proctor argues, the affidavit ambiguously states that Mr. Green-Ashe was "contacted by [Mr. Proctor] via cellphone," which could mean that Mr. Proctor used a land line to call Mr. Green-Ashe's cell phone. We agree with the United States, however, that the language in the affidavit is more naturally read to mean that Mr. Proctor used a cell phone to communicate with Mr. Green-Ashe. In any event, "courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." *Gates*, 462 U.S. at 236 (brackets, ellipses, and internal quotation marks omitted); *see also, e.g.*, *United States v. Pimentel*, 26 F.4th 86, 93 (1st Cir. 2022) (although warrant was ambiguous, reasonable officer could have understood warrant to authorize search at issue, which "support[s] a finding of good faith").

Second, Mr. Proctor points out that the police arrested him eighteen days after the robbery, and he might have changed cell phones during that period. That was of course possible, but the officers could reasonably infer that it was unlikely that Mr. Proctor had done so. *See, e.g.*, *State v. White*, 226 A.3d 1066, 1092-93 (Conn. App. Ct. 2020) (noting "reasonable inference that [cell phones] typically are retained and used for months or years").

Third, relying on this court's recent decision in *Burns v. United States*, 235 A.3d 758 (D.C. 2020), Mr. Proctor argues that the good-faith exception does not apply. Specifically, Mr. Proctor argues that the affidavit in this case was a "bare bones" affidavit that "stated no facts that even arguably provided a reason to believe that any other information or data on the phones had any nexus to the [robbery] investigation." We disagree. We will discuss the *Burns* decision at greater length *infra*. For current purposes it suffices to note two important differences between this case and *Burns*: the indication that Mr. Proctor contacted Mr. Green-Ashe via cell phone to set up the robbery, and the general information in the affidavit about cell-phone use in similar circumstances. Without deciding whether the affidavit actually did establish probable cause, we conclude that the officers could reasonably have believed that the affidavit established probable cause that the cell phone contained

evidence of the robbery, including locational information and other evidence such as communications with Mr. Green-Ashe and among the participants in the robbery.

**3.**

Mr. Proctor also argues that the warrant was overbroad and lacking in particularity, because it authorized the police to look through the entirety of Mr. Proctor's cell phone, without limitation. We hold that the officers could reasonably have believed that the warrant was neither overbroad nor insufficiently particular.

As of 2018, this court had not addressed issues relating to the proper scope of a search warrant for a cell phone. A number of courts had held, however, that a warrant to search a suspect's cell phone was sufficiently particular and/or not overbroad because the warrant limited the officers to searching for and seizing evidence of a specific crime. *See, e.g.*, *United States v. Bass*, 785 F.3d 1043, 1049-50 (6th Cir. 2015) (upholding warrant authorizing search of cell phone for evidence related to charges of wire fraud, credit fraud, and identity theft; "Federal courts . . . have rejected most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers, because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity such that a broad,

expansive search of the computer may be required. Here, the warrant authorized the search for any records of communication, indicia of use, ownership, or possession, including electronic calendars, address books, e-mails, and chat logs. At the time of the seizure, however, the officers could not have known where this information was located in the phone or in what format. Thus, the broad scope of the warrant was reasonable under the circumstances at that time.") (citations, brackets, and internal quotation marks omitted); *cf. State v. Shaskus*, 66 N.E.3d 811, 813-27 (Ohio Ct. App. 2016) (upholding warrant to search Yahoo account for evidence of offense of compelling prostitution; although warrant did not contain temporal limitation, temporal limitations are not mandatory where, for example, warrant "contained sufficient subject-matter limitations to satisfy the particularity requirement") (internal quotation marks omitted; citing cases). There also was authority pointing in the opposite direction. *See Buckham v. State*, 185 A.3d 1, 18-19 (Del. 2018) (warrant authorizing search of suspect's cell phone for evidence of shooting was overbroad and lacking in particularity, because warrant authorized general search of cell phone for evidence of shooting and imposed no temporal limitations).

It appears to be undisputed that the warrant in this case permitted the officers to search the cell phone's contents only for evidence of the robbery. In light of the case law discussed above, we conclude that the officers in this case could reasonably

have believed that such a warrant was neither insufficiently particular nor overbroad. *See, e.g.*, *Richardson v. State*, 259 A.3d 156, 172-74 (Md. Ct. Spec. App. 2021) (even if warrant to search cell phone was defective, because among other things it lacked explicit temporal limits, evidence obtained was admissible under good-faith exception), *cert. granted*, 263 A.3d 512 (Md. 2021).

Here too we emphasize that our ruling is narrow. We need not and do not express any view as to whether the warrant in this case actually was or was not overbroad or lacking in particularity.

In arguing that the evidence in this case should have been suppressed, Mr. Proctor relies heavily on this court's decision in *Burns*, 235 A.3d 758. *Burns* involved search warrants executed for two cell phones that the police seized from Mr. Burns the day after a fatal shooting. *Id.* at 766-67. At the time the warrants were obtained, Mr. Burns was not a suspect. *Id.* at 771. The affidavits in support of the search warrants indicated that Mr. Burns was the decedent's best friend; Mr. Burns and the decedent had exchanged texts on the day of the shooting; and the decedent's cell phone was missing. *Id.* at 768-69. The affidavits further stated that the affiant had probable cause to believe that the cell phones contained evidence related to the shooting, such as who possessed the cell phones and the whereabouts

of the cell phones on the night of the shooting.  *Id.* at 769.  The warrants authorized a search of the entire contents of the cell phones for records relating to the shooting.  *Id.*  The warrants also authorized a search of all records of internet activity using the cell phones, without any limitation.  *Id.*

The court held that the affidavits established probable cause that the cell phones would contain certain specific categories of information, such as GPS information and the timing of text messages between Mr. Burns and the decedent on the night of the shooting.  *Burns*, 235 A.3d at 774.  The court further held, however, that the affidavits failed to establish probable cause supporting a search of the entire contents of the cell phones.  *Id.* at 774-78.  The court thus held that the warrants were overbroad, because they lacked any temporal limits and authorized the search of all information on the cell phones.  *Id.* at 774-78.

*Burns* involved circumstances quite different from those of the present case, because -- as the court emphasized in *Burns* -- the cell phones in *Burns* were seized from someone who was not a suspect in a crime.  *Burns*, 225 A.3d at 771, 776, 779.  Nevertheless, the court's broader reasoning in *Burns* would be of central importance if we were deciding whether the warrant in this case fully satisfied the requirements of the Fourth Amendment.  As previously noted, however, we are not deciding that

question. Rather, we are deciding whether the officers in this case, when obtaining and executing the warrant in 2018, could reasonably have relied on the issuing judge's determination that the warrant was valid. Because *Burns* was not decided until 2020, the officers in this case could not have considered the reasoning in *Burns* when obtaining and executing the warrant in this case.

In a discussion that is more directly relevant to our rulings in this case, the court in *Burns* also held that the evidence obtained from the cell-phone searches (which took place in 2015) should have been suppressed, notwithstanding the good-faith exception to the exclusionary rule. *Burns*, 235 A.3d at 778-81. In reaching that conclusion, the court noted, among other things, that (1) Mr. Burns was not a suspect at the time the warrants were obtained and executed; (2) the affidavits made a "slender" showing of probable cause, only as to three narrow categories of information; and (3) the warrants were extremely overbroad, authorizing a search of everything on both cell phones. *Id*. at 774, 779.

This case is quite different from *Burns*. There was probable cause to believe that Mr. Proctor had participated in the robbery. As we have held, the officers in this case could reasonably have believed that the warrant established probable cause to believe the cell phone seized from Mr. Proctor contained "a range of relevant

evidence." *Burns*, 235 A.3d at 776. Under the circumstances, and in light of the case law discussed above, we hold that the officers in this case could reasonably have relied on the judicial officer's issuance of the warrant. We therefore uphold the trial court's denial of Mr. Proctor's motion to suppress the evidence obtained as a result of the search of Mr. Proctor's cell phone.

**B.**

Mr. Abney argues that the trial court should have excluded evidence that Mr. Green-Ashe identified Mr. Abney from a photo array, because the circumstances of that identification were impermissibly suggestive. We disagree.

A defendant seeking suppression of identification evidence bears the initial burden of showing that the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *United States v. Brown*, 700 A.2d 760, 761 (D.C. 1997) (internal quotation marks omitted). We agree with the trial court that Mr. Abney failed to demonstrate that the identification procedure was impermissibly suggestive.

In denying Mr. Abney's motion to suppress identification evidence, the trial court found that the nine photos in the array were similar and did not draw special attention to Mr. Abney's photo. Having viewed the photo array, we agree.

Mr. Abney argues, however, that only his photo depicted a man in a white t-shirt with short dreadlocks. To the contrary, another man in the array wore a near-identical white shirt and had dreadlocks of a comparable length. In any event, an array is not impermissibly suggestive simply because the defendant's photo is unique in some respect. *See, e.g.*, *Jones v. United States*, 879 A.2d 970, 976 (D.C. 2005) (explaining that photo array was not impermissibly suggestive, even though defendant's photo alone was somewhat washed out and showed defendant's eyes partially closed; defendant was similar in size and appearance to others pictured in photo array, so that defendant's photo did not "stand out dramatically") (internal quotation marks omitted); *Johnson v. United States*, 470 A.2d 756, 759 (D.C. 1983) ("Where an important identifying characteristic is not involved, the presence of a distinguishing feature on the selected photograph does not necessarily render a photo array unduly suggestive.") (internal quotation marks omitted).

With respect to the procedure used, the trial court found that (1) to reduce any suggestivity, the identification procedure was administered by an investigator who

was not familiar with the case; and (2) neither of the two investigators present suggested in any way whom Mr. Green-Ashe should pick. The trial court therefore concluded that the identification procedure was not unduly suggestive. We agree.

We are not persuaded by Mr. Abney's challenges to the identification procedure. First, Mr. Abney argues that no one explained to Mr. Green-Ashe why the identification procedure took place in a car rather than inside the police station. Mr. Abney does not explain, however, why that would create undue suggestivity, and we see no reason why it would.

Second, Mr. Abney points out that one of the investigators, who did not conduct the identification procedure but was present, did have information about the investigation. Mr. Abney argues that that investigator could have subconsciously signaled to Mr. Green-Ashe that Mr. Abney's photo was the correct one. As that investigator acknowledged in this case, the possibility of such subconscious influence is a valid concern. *See, e.g.*, *Heath v. United States*, 26 A.3d 266, 272 (D.C. 2011) (discussing expert testimony recommending that identification procedures be conducted by officers who do not know identity of suspect). The trial court in this case found, however, that neither investigator indicated "in any way" whom Mr. Green-Ashe should select. Mr. Abney has not challenged that finding.

More generally, courts have declined to hold that the mere risk of subconscious influence renders an identification procedure impermissibly suggestive. *E.g.*, *United States v. Coleman*, 851 F. App'x 1016, 1021 (11th Cir. 2021).

**C.**

Mr. Proctor raises two related challenges to the conspiracy charge: that the indictment impermissibly charged two separate conspiracies in a single count and that the evidence at trial proved two conspiracies rather than one. We see no basis for relief.

The conspiracy count in the indictment alleged that over a period of approximately two months, Mr. Abney and Mr. Proctor conspired with other unknown persons to commit robberies. In support of that allegation, the indictment alleged numerous overt acts relating to the charged robbery in this case. The indictment also alleged a more general overt act: that in the weeks before and after the robbery Mr. Proctor and Mr. Abney sent text messages about plans to rob drug dealers.

We agree with the trial court that the indictment permissibly charged a single conspiracy to rob, with overt acts relating to the general planning of robberies and the commission of one particular robbery. *Cf. United States v. Gilbert*, 721 F.3d 1000, 1005 (8th Cir. 2013) (upholding conviction for single conspiracy to commit robbery, based on evidence of two-year period of planning, prior attempts, and completed robbery). The evidence at trial tracked the allegations in the conspiracy count, and we therefore also hold that the jury permissibly found Mr. Proctor guilty of a single conspiracy. *See id.*; *see generally Tann v. United States*, 127 A.3d 400, 424 (D.C. 2015) ("The existence of a single conspiracy or multiple conspiracies is primarily a question of fact for the jury.") (internal quotation marks omitted).

We are not persuaded by Mr. Proctor's arguments to the contrary. Mr. Proctor argues that (1) the alleged general planning was done by text, but there was no evidence that Mr. Proctor and Mr. Abney communicated by text in connection with the charged robbery; and (2) the general plan was to rob drug dealers, but Mr. Green-Ashe was not merely a drug dealer but also an acquaintance. Such minor differences do not support a conclusion that the indictment impermissibly charged two distinct conspiracies, rather than a single agreement "with a core common purpose." *Tann*, 127 A.3d at 429.

**D.**

Mr. Proctor also argues that the conspiracy charge was impermissibly brought in the same indictment as the substantive charges relating to the robbery. We conclude to the contrary.

An indictment can permissibly charge multiple defendants who have participated "in the same series of acts or transactions[] constituting an offense or offenses." Super. Ct. Crim. R. 8(b). We determine de novo whether Rule 8(b)'s requirements have been met. *King v. United States*, 74 A.3d 678, 683 (D.C. 2013).

The indictment charged Mr. Abney and Mr. Proctor with conspiring to commit robbery and jointly committing a robbery and related offenses in furtherance of that conspiracy. Those charges were properly joined in a single indictment. *See, e.g.*, *United States v. Williams*, 553 F.3d 1073, 1078-79 (7th Cir. 2009) ("A conspiracy charge combined with substantive counts arising out of that conspiracy is a proper basis for joinder under Rule 8(b)."); *United States v. Carson*, 455 F.3d 336, 373 (D.C. Cir. 2006) (allegation that offenses were overt acts in furtherance of conspiracy "provided the necessary link to satisfy Rule 8(b)"); *United States v. Ledbetter*, 137 F. Supp. 3d 1042, 1051 (S.D. Ohio 2015) (conspiracy and overt acts

in furtherance of conspiracy properly joined under Rule 8(b); joinder of conspiracy count and substantive counts arising out of conspiracy is permissible "because the fundamental principle of a conspiracy count is the agreement to a common plan or scheme . . . .") (internal quotation marks omitted; citing cases), *aff'd*, 929 F.3d 338 (6th Cir. 2019); *see generally, e.g.*, *Davis v. United States*, 367 A.2d 1254, 1260 n.8 (D.C. 1976) (in interpreting Super. Ct. Crim. R. 8(b), court "is guided by" federal decisions interpreting Fed. R. Crim. P. 8(b)).

## E.

Mr. Abney and Mr. Proctor argue that the substantive charges relating to the robbery should have been tried separately from the conspiracy charge. We uphold the trial court's discretionary decision to try the charges together.

Under Super. Ct. Crim. R. 14, the trial court has discretion whether to sever charges. *Parker v. United States*, 249 A.3d 388, 409 (D.C. 2021). To obtain reversal of a trial court's decision not to sever charges under Rule 14, an appellant must show "the most compelling prejudice." *Id.* (internal quotation marks omitted). We see no basis for reversal.

In general, refusal to sever charges is not an abuse of discretion if evidence of the charges would be admissible at both trials if the charges were severed. *Parker*, 249 A.3d at 409. In this case, the evidence was that both Mr. Abney and Mr. Proctor joined a conspiracy to rob, and then they both committed a robbery and related offenses in furtherance of that conspiracy. Mr. Abney and Mr. Proctor do not appear to dispute that evidence of the robbery and related offenses would be admissible in a trial only of the conspiracy charge. We agree. *See, e.g.*, *Morten v. United States*, 856 A.2d 595, 606 n.10 (D.C. 2004) (proof of overt act admissible to prove conspiracy); *see generally, e.g.*, *Castillo-Campos v. United States*, 987 A.2d 476, 493 (D.C. 2010) ("In a conspiracy case, wide latitude is allowed in presenting evidence, and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged.") (internal quotation marks omitted).

Conversely, proof of the conspiracy to rob and the related preparations to commit robbery would be admissible to prove the robbery and related offenses. *See, e.g.*, *Joyner v. United States*, 818 A.2d 166, 173 (D.C. 2003) (evidence that defendants conspired to kill victim was admissible as direct evidence of murder charge); *Loukas v. United States*, 702 A.2d 681, 683 (D.C. 1997) (severance properly denied where evidence of offenses would have been mutually admissible as evidence

of common scheme or plan); *United States v. Irizarry*, 341 F.3d 273, 289 (3d Cir. 2003) ("[T]he claim of conspiracy provides a common link, and demonstrates the existence of a common scheme or plan.") (emphasis and internal quotation marks omitted).

**F.**

Mr. Abney and Mr. Proctor raise other evidentiary issues, but we decline to decide those issues at this juncture. *See, e.g.*, *In re J.W.*, 258 A.3d 195, 208 (D.C. 2021) (after vacating and remanding for possible retrial, court declined to decide evidentiary issue, because it was unclear whether, and if so how, issue would arise on remand).

For the foregoing reasons, we vacate the judgments of the Superior Court and remand for further proceedings.

*So ordered.*